**IN THE UNITED STATES DISTRICT COURT IN THE
EASTERN DISTRICT OF VIRGINIA, RICHMOND DIVISION**

| | |
|---|---|
| **VIOLET A. SMITH, as Administrator of the ESTATE OF SABIN MARCUS JONES, deceased,** | |
| **Plaintiff,** | **No. 3:19-cv-00046-MHL** |
| **v.** | |
| **TOWN OF SOUTH HILL, et al.,** | |
| **Defendants.** | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS
CPL. CHRIS PARROTT AND LT. SCOTT ZINCONE'S
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT(ECF No. 29)**

Plaintiff, Violet A. Smith, as Administrator of the Estate of Sabin Marcus Jones, Deceased submits this opposition to the Defendants Cpl. Chris Parrott and Lt. Scott Zincone's Motion to Dismiss. Plaintiff incorporates by reference her Memorandum of Law as if set forth more fully herein. Plaintiff also incorporates by reference the oppositions to the companion motions to dismiss Plaintiff' Amended Complaint submitted by other defendants at ECF Nos. 25, 27 and 31.

Respectfully submitted,

By:  */s/ William H. O'Brien*
    **DOUMMAR & O'BRIEN**
    William H. O'Brien
    Counsel for Plaintiff
    1397 Laskin Road
    Virginia Beach, VA  23451
    happy@doummarandobrien.com
    Telephone 757-422-0061
    Fax 757-422-5512

1

| | |
|---|---|
| VIOLET A. SMITH, as Administrator of the ESTATE OF SABIN MARCUS JONES, deceased,<br><br>        **Plaintiff,**<br><br>v.<br><br>**TOWN OF SOUTH HILL, et al.,**<br><br>        **Defendants.** | No. 3:19-cv-00046-MHL |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
DEFENDANTS CPL. CHRIS PARROTT AND LT. SCOTT ZINCONE'S
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT(ECF No. 29)**

## I.    INTRODUCTION

This case involves Defendants' unconstitutional mistreatment of a mentally ill Virginia citizen. On January 11, 2016, in *Armstrong v. The Village of Pinehurst*, the United States Court of Appeals for the Fourth Circuit announced a bright line rule that police officers use unreasonably excessive force in violation of the United States Constitution when "during the course of seizing an outnumbered mentally ill individual who is a danger only to himself, police officers choose to deploy a taser in the face of stationary and non-violent resistance to being handcuffed." 810 F.3d 892, 910 (4th Cir. 2016), *cert denied* 137 S.Ct. 61.

On January 20, 2017, slightly more than one year later, law enforcement officers from the Town of South Hill and the Mecklenburg County Sheriff's Department obliterated the bright line the Fourth Circuit established in *Armstrong* when they tased to death Sabin Marcus Jones ("Marcus") in a convenience store parking lot. Like the victim in *Armstrong*, Marcus had committed no crime and was unarmed, outnumbered, surrounded, mentally ill and stationary when Defendants illegally deployed their taser weapons in violation of federal law.

Plaintiff Violet A. Smith, Administrator of the Estate of Sabin Marcus Jones, is Marcus' mother. Her 29-page, 188-paragraph Amended Complaint details with heartbreaking specificity the outrageous misconduct of the officials from the Town of South Hill and the Mecklenburg County Sheriff's Department. The facts here are a "virtual facsimile" to those in *Armstrong* because in both cases law enforcement officials tased to death an unarmed, mentally ill, stationary and outnumbered man. Like the victim in *Armstrong*, when the police descended upon him, Marcus was sitting alone in his car and completely surrounded. Marcus was unarmed and contained within his vehicle and posed no danger to the officers who outnumbered him. Under those circumstances, the Fourth Circuit instructs the South Hill Police Department and the Mecklenburg County Sheriff's Department that, "The degree of force necessary to prevent an individual who is affirmatively refusing to move from fleeing is **obviously quite limited**." *Id.* at 901. (emphasis added). But the Defendants did not use limited force. What they did is nothing short of barbaric.

Though the Fourth Circuit warned the South Hill Police and the Mecklenburg County Sheriff's Department that they were "on notice" not to inflict unnecessary force, Defendants assert that they were justified in surrounding him, smashing two car windows, dragging Marcus from his vehicle, breaking his ribs, placing a rag in his mouth and tasing him to death. Through these motions, Defendants moved to dismiss the Amended Complaint under Rule 12(b)(6) and ask this Court to assume the role of "Super Juror" to declare that their conduct was appropriate. This is not a close case.

*Armstrong* alone does not bar the officers' deployment of their tasers. So do *Meyers v. Balt. County*, 713 F.3d 723 (4th Cir. 2013) and *Bailey v. Kennedy*, 349 F.3d 731 (4th Cir. 2003) which prohibit the use of force after the individual is secured. Here, Defendants tased Marcus after they laid on top of him. Defendants do not mention that. Defendants' desperation to avoid

answering the Amended Complaint and testifying about these facts under oath is palpable throughout their collective 120 pages of argument. Defendants' conduct is so shockingly unconstitutional that there are no plausible explanations for the killing of Marcus. Either the officers were woefully ignorant of *Armstrong, Meyers* and *Bailey* and the bright lines they established or they willfully ignored it. Either way, they are liable under §1983 for Marcus' death.

Couched as a 12(b)(6) motion, Defendants really seek summary judgment under Rule 56 — except that Defendants request this Court to weigh facts in their favor instead of the summary judgment standard that requires the facts to be weighed in favor of the plaintiff. Defendants argue the merits of Plaintiff's Amended Complaint and attempt to distinguish the brutal factual scenario here from that in *Armstrong*. To do so, Defendants embark on a line by line comparison between the facts of this case and those of *Armstrong*. That Defendants quibble with so many facts here proves she Plaintiff has more than satisfied her pleading requirements under the Federal Rules and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The only question the Court must address in deciding a 12(b)(6) motion is whether Plaintiff has stated a "plausible claim." *Armstrong* establishes that this case is more than that. Not only is this claim plausible, but the facts confirm even at this early date that Defendants are not entitled to qualified immunity.

Not only does Plaintiff's Amended Complaint state a plausible claim satisfying the Rule 12 standard, but it also establishes a that Defendants would not be entitled to qualified immunity under Rule 56 review. To accept Defendants' early invocation of qualified immunity based on their nitpicking of the facts (e.g. Marcus was in a car, Armstrong was hugging a pole) would reduce the bright line the Fourth Circuit established in *Armstrong*, and the constitutional rights it secures, to nothing. The Fourth Circuit warned against such "deteriorative creep" and

"degradation of constitutional rights" which "will reduce the meaning of the Constitution to the lowest possible conception of its content." *Id*. at 909 (internal citations omitted). Still, that does not dissuade Defendants here.

Plaintiff adequately pled that Defendants violated Marcus' constitutional rights because they tased to death a mentally ill man who was unarmed, outnumbered and stationary in violation of the bright-line rule set forth in *Armstrong*. But the facts here are so much worse than in *Armstrong*. Here, Defendants here drew their guns on Marcus, smashed two car windows, dragged him out of his vehicle, laid on him, tased him twice in probe mode (the more lethal application), broke his ribs, and placed a rag in his mouth. The decedent in *Armstrong* suffered none of these horrors. Defendants' Motions ignore these atrocities altogether. The only way Defendants would be entitled to dismissal under either Rule 12 or Rule 56 is if *Armstrong* did not apply to them. It does. So does *Bailey* and *Meyers*. Defendants are not free to ignore them. Accordingly, this Court should deny their Motions to Dismiss Plaintiff's Amended Complaint.

## II.    FACTUAL BACKGROUND

On December 29, 2016, Marcus Jones had been admitted to the Virginia Beach Psychiatric Center. Am. Compl. ¶79. On January 6, 2017, he was discharged. *Id.* at ¶80. On January 20, 2017, Marcus' aunt Sheila Holmes had determined her nephew had not been taking his prescribed medications and at 10:50 am went to the South Hill Police Department to request that they place him in custody under an Emergency Custody Order. *Id.* at ¶81. Marcus' mental status and mental illness had been long known to the South Hill Police. *Id.* at ¶82.

The South Hill Police went to pick up Marcus at his house on 3509 Chaptico Road, South Hill, Virginia, but he was not there. Am. Compl. at ¶83. At 2:00 pm, Sheila Holmes found her nephew parked at the EZ Convenient Stop store in South Hill and called the police. *Id.* at ¶84. At 2:15, eight police officers from the South Hill Police Department and the Mecklenburg

County Sheriff's Office found Marcus still in his parked car at the EZ Convenient Stop. *Id.* at ¶85. Police officers from South Hill and the Mecklenburg County Sheriff's Department surrounded Marcus with their police cruisers while he sat inside his car. *Id.* at ¶6. Marcus was unarmed, he was not on the influence of any drugs or alcohol, and he was not a threat to anyone when the officers descended upon him. *Id.* at ¶7. They walked up to the car and Marcus turned his car on to drive away. Am. Compl. at ¶86. Two officers blocked his vehicle with their cruisers. *Id.* at ¶87. Two South Hill officers instructed Marcus to get out of the car but he refused. *Id.* at ¶88. Marcus was stationary in his car and he was completely outnumbered by the police. *Id.* at ¶89.

Marcus was unarmed and posed no danger to the officers who outnumbered him. *Id.* at ¶90. Despite knowing that Marcus was mentally ill and despite the clear limitations set forth by the Fourth Circuit prohibiting an escalation of force, an officer then broke the driver's side window. *Id.* at ¶92. Marcus then moved to the passenger side of the vehicle. Am. Compl. at ¶93. A second officer then broke the passenger side window and opened the door and removed him from the vehicle. *Id.* at ¶94. The officers knew that Marcus was mentally ill when they smashed his window and dragged him from his vehicle. *Id.* at ¶8.

Officers had removed their guns and Marcus' Aunt Sheila Holmes hollered at them, "Don't shoot him! He's off his medication and you guys know his situation." *Id.* at ¶95. Then the officers put their guns away and took out their tasers. *Id.* at ¶96. The officers threw Marcus to the ground and laid on him. Am. Compl. at ¶9. Officer Waters deployed his taser and struck Marcus in the chest. *Id.* at ¶98. They tased him repeatedly. *Id.* at ¶10. The probes from the officers' taser weapons made full contact with Marcus resulting in four "encrusted lesions" in his right and left chest. *Id.* at ¶11.

Sheila Holmes observed Marcus' eyeballs rolling into the back of his head. *Id.* at ¶100. The officers continued to tase him as he was pinned to the pavement. Am. Compl. at ¶101. The officers then pumped the area around Marcus' heart with a deadly amount of voltage. *Id.* at ¶12. An eyewitness begged the officers to "get off" Marcus because "he can't breathe." *Id.* at ¶13.

Between violently pulling him from the car, throwing him on the ground, and laying on top of him, the officers broke one of Marcus' ribs. *Id.* at ¶15. While Marcus was laying on the ground, a police officer retrieved a rag from his vehicle and placed it in his mouth. *Id.* at ¶102. An eyewitness saw this. Am. Compl. at ¶16. As Marcus groaned, an officer yelled, "Do you want to do this?" *Id.* at ¶103. Marcus began to have a seizure. *Id.* at ¶17. Marcus became unresponsive. *Id.* at ¶¶18 and 104. No one from the South Hill Police Department or the Mecklenburg County Sheriff's Department stopped the unconstitutional violent mistreatment and taser use on an unarmed, outnumbered and mentally ill man. *Id.* at ¶99.

The officers then put Marcus' unresponsive body into the back of a police van and took him to the hospital. Am. Compl. at ¶105. Marcus was transferred to VCU-MCU Hospital in Richmond. *Id.* at ¶108. There, he was placed on a ventilator for 5 days and ultimately died on January 24, 2017. *Id.* at ¶109. Pathologist Michael Hays, M.D., medical examiner for Mecklenburg County, performed an autopsy and found:

> A 2 inch healing linear abrasion is present on the left side of the chest. Present on the right of the chest is a pair of crusted puncture lesions measuring 1/16 inch each and spaced 1 1/4 inches apart. Present on the left lateral aspect of the chest is a pair of crusted lesions ranging from 3/6 to 3/8 inch in diameter. The lower lesion displays a 1/16 inch central puncture. The lesions are spaced 1 1/4 inches apart.

*Id.* at ¶110. Dr. Hays listed the pathological diagnoses and cause of death as, "Complications of anoxic brain injury due to excited delirium syndrome associated with schizophrenia, physical

exertion and **conducted electrical weapon use**." (emphasis added). *Id.* at ¶111. The Virginia

State Police conducted an investigation and issued the following statement:

> At approximately 2:40 p.m. Friday, the Mecklenburg County Sheriff's Office was following up on an Emergency Custody Order (ECO) requested by a family member for Sabin M. Jones, 44, of South Hill, Va. A family member advised the deputies that Jones was at a convenience store/gas station in the 800 block of North Mecklenburg Avenue in the town of South Hill.
>
> The deputies located Jones inside a late-model Chevrolet Camaro at the convenience store/gas station. When the deputies approached him to serve the ECO, he refused to exit his vehicle. He backed into one of the deputies' vehicles and then began driving forward, at which time additional deputies, with the assistance of South Hill Police, were able to block the Camaro from leaving the parking lot.
>
> Despite the deputies' and officers' repeated attempts to talk to Jones and have him exit his locked vehicle, he refused and became increasingly agitated. To prevent Jones from harming himself inside the vehicle, a deputy broke open one of the vehicle's windows and negotiations continued with Jones in an attempt to calm him down and get him to safely exit the Camaro. When Jones began kicking and punching the inside of the Camaro, a deputy broke open a second window on the car. Jones then exited the vehicle in an aggressive manner towards the deputies and officers. As the deputies and officers attempted to apprehend Jones, he became increasingly combative. One of the South Hill Police Officers deployed his Taser to bring Jones under control. After the deployment, Jones remained non-compliant with the deputies' and officers' commands as they attempted to handcuff him. Jones also began banging his head against the ground.
>
> Due to Jones' heightened state of agitation and contact with the Taser, he was transported to VCU Health Community Hospital in South Hill. The hospital then transferred Jones to the VCU Medical Center in Richmond, where he passed away Tuesday, Jan. 24, 2017. His remains were transported to the Office of the Chief Medical Examiner in Richmond for autopsy and examination.
>
> At the request of Mecklenburg County Sheriff R.W. "Bobby" Hawkins Jr. and South Hill Police Chief Stuart Bowen, the Virginia State Police is investigating the incident. The investigation remains ongoing at this time.

Am. Compl. at ¶112.

The four crusted puncture lesions noted on his autopsy reveal that Marcus was tased in

probe mode by two different tasers, and therefore, by two different officers. The Virginia State

Police statement omits the fact that another unidentified officer tased Marcus. The identity of the

second officer who deployed his taser remains unknown to Plaintiff. Discovery of the Virginia

State Police investigative file and the officers' taser logs will reveal the time, duration and voltage of the tases applied to Marcus.

## III.    ARGUMENT

### A.    The Motion to Dismiss Standard

The Federal Rules of Civil Procedure provide that a plaintiff adequately pleads his or her claim by stating nothing more than "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). The Supreme Court has explained that this requirement is intended to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoted with approval in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Supreme Court has stated that a complaint must "contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court clarified this standard as, "A claim has factual plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

 "To survive a motion to dismiss, the factual allegations in a complaint, assumed true, must suffice 'to state a claim to relief that is plausible on its face.'" *Twombly*, 550 U.S. at 570. When ruling on a Rule 12(b)(6) motion to dismiss, "a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94, (2007). Further, "the Court must draw all reasonable inferences in favor of the plaintiff." *Nemet Chevrolet, Ltd. v Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). To survive the motion, a complaint must contain sufficient facts to state a claim that is "plausible on its face." *Twombly*, 550 U.S. at 570. A complaint "need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Coleman v. Md. Ct. of Apps.*, 626 F.3d 187, 190 (4th Cir. 2010) (internal

quotation marks omitted). Moreover, "the court must read the instant complaint in its entirety, and must not 'scrutinize each allegation in isolation but [must] assess all of the allegations holistically.'" *Tellabs, Inc. v. Makor Issues & Rights, Lds*., 551 U.S. 308, 325, (2007). Defendants "may not 'cherry pick' specific allegations in the complaint that might be insufficient standing alone." *Id*.

Plaintiff's Section 1983 claims for Defendants' violations of her son's constitutional rights are not just plausible, they are compelling.

**B.      Plaintiff Adequately States A Claim Under 42 U.S.C. § 1983.**

42 U.S.C. § 1983 provides a civil action for the deprivation of rights against:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see also Jenkins v. Medford*, 119 F.3d 1156, 1159-160 (4th Cir. 1997); *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 658 (4th Cir. 1998).

**1.      Plaintiff States a Claim Under the Fourth Circuit's Holding in *Armstrong v. Pinehurst***

In *Armstrong v. The Village of Pinehurst,* the United States Court of Appeals provided the framework on how law enforcement officers must treat an unarmed, mentally ill citizen who has committed no crime when executing an involuntary commitment order. 810 F.3d at 910. The Fourth Circuit held that law enforcement officers should be on notice that taser use violates the Fourth Amendment:

Where, during the course of seizing an out-numbered mentally ill individual who is a danger only to himself, police officers choose to deploy a taser in the face of stationary and non-violent resistance to being handcuffed, those officers use unreasonably excessive force.

*Id.*

The Fourth Circuit provided a clear warning to the Defendants:

When Appellees decided to begin using force, Armstrong, who stood 5'11" tall and weighed 262 pounds, was stationary, seated, clinging to a post, and refusing to move. He was also outnumbered and surrounded by police officers and security guards. **The degree of force necessary to prevent an individual who is affirmatively refusing to move from fleeing is obviously quite limited.**

*Id.* at 901. (emphasis added). Just as in *Armstrong*, when the officers here "decided to begin using force," Marcus was "stationary, seated [in his car]" and "refusing to move [out of the car]." *Id.* (ellipses added). Like Armstrong, Marcus was "outnumbered and surrounded by police officers and [members of the Mecklenburg County Sheriff's Office]." Against this similar backdrop, Defendants decided to use force. In *Armstrong*, the Fourth Circuit found that the use of force on the mentally ill can create liability under §1983:

Mental illness, of course, describes a broad spectrum of conditions and does not dictate the same police response in all situations. But "in some circumstances at least," it means that "increasing the use of force may . . . exacerbate the situation." *Deorle* [*v. Rutherford*,] 272 F.3d at 1283. Accordingly, "the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis." *Id.* And even when this ideal course is not feasible, officers who encounter an unarmed and minimally threatening individual who is "exhibit[ing] conspicuous signs that he [i]s mentally unstable" must "de-escalate the situation and adjust the application of force downward."

*Id.* at 900. (citing *Martin v. City of Broadview Heights*, 712 F.3d 951, 962 (6th Cir. 2013)).

The Fourth Circuit based its findings in *Armstrong* on a similar decision from the United States Court of Appeals for the Ninth Circuit and determined:

[T]he use of force that may be justified by" the government's interest in seizing a mentally ill person, therefore, "differs both in degree and in kind from the use of

force that would be justified against a person who has committed a crime or who poses a threat to the community.

*Id.* (citing *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010) (alteration omitted) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir. 2001)). Accordingly, Defendants were on notice of the finding the Fourth Circuit promulgated:

> Where a seizure's sole justification is preventing harm to the subject of the seizure, the government has little interest in using force to effect that seizure. Rather, using force likely to harm the subject is manifestly contrary to the government's interest in initiating that seizure. *See Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003) (When "a mentally disturbed individual not wanted for any crime . . . [i]s being taken into custody to prevent injury to himself[,] [d]irectly causing [that individual] grievous injury does not serve th[e officers'] objective in any respect.").

*Id.* at 901.

Based on the Fourth Circuit's pronouncements in *Armstrong* establishing a bright line rule prohibiting taser use on an unarmed, outnumbered, surrounded, stationary and mentally ill man, it is axiomatic that a complaint which asserts similar (and worse) facts sets forth a plausible claim. *Id.* Plaintiff's Amended Complaint asserts that Marcus was outnumbered, unarmed and non-threatening at the time members of the South Hill Police Department and the Mecklenburg County Sheriff's Department shattered his two car windows, dragged him from his car, broke his ribs, tased, and gagged him. To state a plausible claim under *Iqbal/Twombly*, Plaintiff need not say more.  Plaintiff also details that for purposes of effectuating the ECO the "sole justification" of the Defendants' seizure of Marcus was "preventing harm **to himself**. The misconduct which Plaintiff sets forth in her Amended Complaint is prohibited by the dictates in *Armstrong*.

## 2.    The Facts Are Worse Here Than in *Armstrong*

While the decedent in *Armstrong* clung to a pole, Marcus was confined to the inside of his car. The vehicle itself provided the officers with added protection that the officers did not have in *Armstrong*. After the Defendants smashed out the driver's side window, Marcus moved

to the passenger side of the vehicle. That movement eliminated any possibility of Marcus attempting to drive away. Defendants then smashed out the passenger side window. The officers then dragged him out of the car, broke his ribs, laid on him, tased him (at least) twice in probe mode and then placed a cloth in his mouth. The only reason that Marcus was moving at all is that the officers exacerbated the situation by breaking the windows of his car and removing him from it forcibly. He was stationary when they approached. He was stationary when they tased him while lying on him. Marcus weighed 125 pounds. Armstrong weighed more than twice that amount, 262 pounds. Though the unconstitutional mistreatment of Armstrong was horrific, what the officers did to Marcus was worse. Much worse.

*Armstrong* makes clear that Defendants cannot use the execution of an ECO to escalate the use of force against unarmed and mentally ill people. Yet, in an attempt to justify their constitutional violations, Defendants cite to *Simpson v. Virginia*, No. 1:16cv162 (JCC/TCB), 2016 U.S. Dist. LEXIS 132860 (E.D. Va.), a §1983 case where the mentally ill person repeatedly fired shots at police officers. *Id*. at *7. Before his death, the decedent in *Simpson* "exited the house, firing shots as he did so." *Id*. The district court distinguished the facts in that case from those in *Armstrong* and found the decedent "was neither unarmed nor minimally threatening." *Id.* Tellingly, Defendants do not argue here that Marcus committed a crime because they cannot. *Id*. ("In contrast to *Armstrong*, Mr. Simpson committed a crime."). They cannot claim that Marcus ever had a weapon, let alone attacked the police officers in a hail of gunfire. There can be no comparison between the *Simpson* case and this one.

Moreover, Defendants' reliance on the ECO does not entitle them to the dismissal of Plaintiff's claims. The Town of South Hill Defendants cite to *Gasner v. County of Dinwiddie*, 162 F.R.D. 280, 282 (E.D. Va. 1995) but that case does not permit this Court to turn a motion to dismiss into a determination on the merits. In *Gastner*, the district court may consider documents

"relied upon" in the complaint where the documents are of "unquestioned authenticity." Plaintiff does not base her claims on the contents of the ECO. There is no doubt that the magistrate issued an ECO. It is also not in doubt that when executing the ECO the Defendants were not permitted to "decide to begin using force" on a stationary, unarmed, outnumbered and surrounded mentally ill man who committed no crime. In this circumstance, the "degree of force" "is obviously quite limited."

### C. Defendants' Request to Dismiss the Claims Against Cpl. Parrott and Lt. Zincone in Their Official Capacities Is Premature.

Defendants assert that Plaintiff's claims against Cpl. Parrott and Lt. Zincone in their official capacities should be dismissed because they are duplicative of her *Monell* claims against the Town of South Hill. Defendants, however, seek to dismiss Plaintiff's *Monell* claims against the Town of South Hill. Therefore, it would be premature to dismiss a claim as "duplicative" when the moving party seeks to dismiss the both claims. Moreover, Defendants fail to cite to any case where the court granted a motion to dismiss the official capacity claims against an individual defendant under §1983. The cases cited by Defendants involve summary judgment.

In *Kentucky v. Graham*, 473 U.S. 159 (1985) the United States Supreme Court distinguished between official capacity suits and personal-capacity suits which seek to impose personal liability upon a government official for actions he takes under color of state law. *Id.* at 165-166 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 237-238 (1974)). Official-capacity suits are those which "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Id.* (quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55 (1978). In *Kentucky v. Graham*, the Supreme Court held:

> As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. *Brandon*, 469 U.S., at 471-472. It is not a suit against the official personally, for the real party in interest is the entity. Thus, while an award

of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.

On the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. *See, e. g., Monroe v. Pape*, 365 U.S. 167 (1961). More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a "'moving force'" behind the deprivation, *Polk County v. Dodson*, 454 U.S. 312, 326 (1981) (quoting *Monell*, supra, at 694); thus, in an official-capacity suit the entity's "policy or custom" must have played a part in the violation of federal law. *Monell, supra; Oklahoma City v. Tuttle*, 471 U.S. 808, 817-818 (1985); *id.*, at 827-828 (BRENNAN, J., concurring in judgment). When it comes to defenses to liability, an official in a personal-capacity action may, depending on his position, be able to assert personal immunity defenses, such as objectively reasonable reliance on existing law. *See Imbler v. Pachtman*, 424 U.S. 409 (1976) (absolute immunity); *Pierson v. Ray*, 386 U.S. 547 (1967)(same); *Harlow v. Fitzgerald*, 457 U.S. 800 (1982) (qualified immunity); *Wood v. Strickland*, 420 U.S. 308 (1975) (same). In an official-capacity action, these defenses are unavailable. *Owen v. City of Independence*, 445 U.S. 622 (1980); *see also Brandon v. Holt*, 469 U.S. 464 (1985).

473 U.S. at 165-67.

Defendants cite to *Ruttenberg v. Jones*, 603 F. Supp.2d 844 (2009) to justify dismissing this case under Rule 12.[1]  Defendants fail to acknowledge that after the district court granted defendants' motion to dismiss the § 1983 claims, the Fourth Circuit reversed.  *See Ruttenberg v. Jones*, 283 Fed. App'x. 121 (4th Cir. 2008)(per curiam)(holding plaintiff's complaint pled sufficient facts to allege a constitutional violation on the basis of an unreasonably conducted administrative search). Far from providing Defendants support, the Fourth Circuit's holding in *Ruttenberg* warrants denial of their Rule 12(b)(6) motion.

### D.    Plaintiff's Amended Complaint Contains Plausible Conspiracy Claims

Defendants claim that Plaintiff fails to sufficiently state a cause of action for conspiracy under 42 U.S.C. §§ 1983 and 1985.  To establish a claim for conspiracy to deprive an individual

---

[1] The case Defendants cite is a summary judgment case. Defendants omit the Fourth Circuit holding which reversed the dismissal of the §1983 claims under Rule 12(b)(6).

of a constitutional right in violation of 42 U.S.C. § 1983, a plaintiff must allege that defendants: (1) "acted jointly in concert"; (2) performed an overt act; (3) "in furtherance of the conspiracy"; (4) that resulted in deprivation of a constitutional right. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996)(citing *Hafner v. Brown*, 983 F.2d 570, 577 (4th Cir. 1992)); *see also Davis v. County of Amherst*, 2008 U.S. Dist. LEXIS 15853 (W.D. Va. 2008).

Here, Plaintiff's Amended Complaint outlines a plausible claim for conspiracy under 42 U.S.C. § 1983 Plaintiff's Complaint is replete with factual allegations that Defendants acted jointly and in concert and performed overt acts (tasering Marcus and depriving him of medical attention) in furtherance of the conspiracy. This joint conduct resulted in the deprivation of Marcus' well-established constitutional rights. Plaintiff's Amended Complaint, when read as a whole and accepted as true, contains sufficient factual matter to support a plausible conspiracy claim. *See* Am. Compl. at ¶¶ 128-130. Plaintiff alleges:

128. Through their refusal to stop the unconstitutional mistreatment of Marcus Jones, Defendants acted in tacit agreement to violate Marcus Jones' rights.
129. In violation of Section 1983 and 1985, Defendants' concerted actions to escalate a confrontation with an outnumbered and mentally ill man constitutes a meeting of the minds in which they agreed to violate Marcus Jones' constitutional rights.
130. Their mistreatment of Marcus Jones evidenced the fact that Defendants reached an understanding to violate Marcus Jones' rights.

*Id.*

To succeed at trial, a Plaintiff does not have to establish direct proof of a conspiracy. Instead, a plaintiff can succeed by showing through circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective. *See Hinkle*, 81 F.3d at 421. A plaintiff can succeed if she presents evidence which will "reasonably lead to the inference that [defendants] positively or tacitly came to a mutual understanding to try and accomplish a common and unlawful plan." *Id*. Thus, Plaintiff "need not produce direct evidence of a meeting

of the minds." *Id.* "If two persons pursue the same object, one performing one part of the act and the other another part of the act so as to complete it, with a view to the attainment of the object to which they are pursuing, this will be sufficient to constitute a conspiracy." *Hafner*, 983 F.2d at 577.

A meeting of the minds does not require a direct connection between all conspirators. It requires only that "the defendant knew of the conspiracy's purpose and some action indicating his participation." *United States v. Brooks*, 957 F.2d 1138, 1147 (4th Cir. 1992). A Plaintiff does not need to prove that a defendant "had knowledge of his coconspirators" or "knowledge of the details of the conspiracy." *Id.* Instead, a plaintiff "need only establish a slight connection between the defendant and the conspiracy." *Id.* A motion to dismiss conspiracy claims should not be granted unless "it appears beyond doubt that the plaintiff can prove not set of facts in support of his claim which would entitle him to relief." *De Sole v. United States*, 947 F.2d 1169, 1177 (4th Cir. 1991). Even though adducing sufficient evidence may appear difficult at the point of a motion to dismiss, the difficulty of doing so cannot be a basis for dismissing conspiracy claims.

Furthermore, the factual allegations outlined above, at a minimum establish the circumstantial evidence would permit Plaintiff to prove her conspiracy claim. *See Hinkle*, 81 F.3d at 421; *see also Hafner*, 983 F.2d at 577. The Complaint sufficiently alleges that: (1) Defendants shared the same objective (tasering Marcus and depriving him of medical care); (2) Defendants openly or tacitly came to a mutual understanding to accomplish the uncommon and unlawful plan of tasering Marcus and depriving him medical attention; and (3) a slight connection existed between all Defendants in furtherance of the conspiracy. *See* Am. Compl. at ¶¶ 128-130. Therefore, Plaintiff has sufficiently stated a valid conspiracy claim under 42 U.S.C. § 1983 and Defendants' Motion should be denied.

Plaintiff has stated a plausible conspiracy claim. Accordingly, Defendants' Motion to Dismiss should be denied.

## E. Defendants Are Not Entitled to Qualified Immunity

Not only does Defendants' 12(b)(6) motion fail, as set forth below, Defendants are also not entitled to qualified immunity under a Rule 56 analysis. Though qualified immunity is generally addressed at the summary judgment stage, Defendants seek dismissal of Plaintiff's Amended Complaint on the basis of qualified immunity. Though premature, Defendants' efforts to escape liability under qualified immunity fails. "When considering a request [by way of summary judgment motion] for qualified immunity, the court considers the facts in the light most favorable to the party opposing granting judgment based on qualified immunity." *Scott v. Harris*, 550 U.S. 372, 378 (2007). "When faced with a motion seeking summary judgment based on qualified immunity, a court must decide whether, viewing the facts in the light most favorable to the plaintiffs, the defendant should prevail based as a matter of law on the asserted qualified immunity." *Id.* "When there is a conflict as to material aspects of what occurred, 'this [factual conflict] usually means adopting…the plaintiff's version of the facts.'" *Id*. Summary judgment on the issue of qualified immunity is only appropriate "if a genuine issue of material fact does not exist as to the actions taken by the officer." *Bostic v. Rodriguez*, 667 F.Supp.2d 591, 607-608 (E.D.N.C. 2009).

### 1. Qualified Immunity Analysis in Excessive Force Cases

The analysis of an excessive force claim brought under § 1983 begins with "identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Courts analyze claims of excessive force under the Fourth Amendment's "objective reasonableness standard." *Orem v. Rephann*, 523 F.3d 442, 446 (4th Cir. 2008). "[E]xcessive force claims of a pretrial detainee [or arrestee] are governed

17

by the Due Process Clause of the Fourteenth Amendment." *Young v. Prince George's County, Maryland*, 355 F.3d 751, 758 (4th Cir. 2004) (quoting *Taylor v. McDuffie*, 155 F.3d 479, 483 (4th Cir. 1998)).

The application of the qualified immunity doctrine requires a two-prong analysis. *See Saucier v. Katz,* 533 U.S. 194, 201 (2001). A court must determine whether the facts shown, "taken in the light most favorable to the plaintiff, establish that the police officer's actions: (1) violated a constitutional right; and (2) that right was 'clearly established' at the time of the challenged conduct." *Id.* "The burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting the defense." *Meyers,* 713 F.3d at 731 (citing *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003)).

### 2. The Officers' Use of Force on Marcus Jones Was Unreasonable and Excessive In Violation of the Fourth Amendment

Under the Supreme Court's holding in *Graham v. Connor*, the Fourth Amendment prohibits police officers from using force which is "excessive" or not "reasonable" in the course of making an arrest. 490 U.S. 386, 395 (1989). The "excessive force" analysis is based on a standard of "objective reasonableness" in examining an officer's conduct in effectuating an arrest taking into account "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 399; *see also Meyers*, 713 F.3d at 732-33. When the subject of a seizure "ha[s] not committed any crime, this factor weighs heavily in [the subject's] favor." *Bailey*, 349 F.3d at 743-44. Other factors to consider are "the threat reasonably perceived by the officer" and "the security problem at issue." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). When determining the reasonableness of an officer's conduct, the officer's subjective interpretation is irrelevant and the court must determine "the

understanding that a reasonably informed police officer should have had of it." *Sevigny v. Dicksey*, 846 F.2d 953, 957 (4th Cir. 1988). The reasonableness inquiry charges the officer "with possession all the information reasonably discoverable by an officer acting reasonably under the circumstances." *Id.* at n. 4. The "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Thomas v. Holley*, 533 Fed. Appx. 208, 215 (4th 2013)(citing *Waterman v. Batton,* 393 F.3d 471, 481 (4th Cir. 2005)). The subjective intent or motivation of the officer is irrelevant. *See Graham*, 490 U.S. at 397.

### 3. The Officers' Multiple Tasings of Marcus Jones Were Unreasonable and Excessive Are Worse than the Ones the Fourth Circuit Condemned In *Armstrong*

As a threshold matter, the Fourth Circuit has recognized that "[d]eploying a taser is a serious use of force." *Armstrong*, 810 F.3d at 902. "The weapon is designed to 'caus[e]... excruciating pain,' *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir. 2010), and application can burn a subject's flesh, *see Orem v. Rephann*, 523 F.3d 442, 447-48 (4th Cir. 2008), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34, 37, 130 S. Ct. 1175, 175 L. Ed. 2d 995 (2010); *cf. Commonwealth v. Caetano*, 470 Mass. 774, 26 N.E.3d 688, 692 (Mass. 2015) ('[W]e consider the stun gun a per se dangerous weapon at common law.')." *Id.* The Fourth Circuit has observed that a taser "inflicts a painful and frightening blow." *Id.* (quoting *Orem*, 523 F.3d at 448, 523 F.3d at 448 (quoting *Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 1993))).

As set forth in *Armstrong*, the Fourth Circuit has warned that "the government has little interest in using force to effect that seizure. Rather, using force likely to harm the subject is manifestly contrary to the government's interest in initiating that seizure." *Armstrong*, 810 F.3d at 901. It was well established in January 2017, that a taser may not be deployed "in the face of

stationary and non-violent resistance to being handcuffed." As such, *Armstrong's* bright line prohibited Defendants' taser use on a stationary, unarmed, surrounded and outnumbered mentally man. The officers' taser deployment on Marcus violated his right to be free from the use of excessive and unreasonable force under the Fourth Amendment.

At the time of the tasings, Marcus Jones was known to the Defendants as being mentally ill, was outnumbered by South Hill Police and Mecklenburg County officers and was "stationary" in his car and after the officers laid on top of him. Marcus Jones had not committed any crime and was not engaged in any criminal conduct at the time members of the South Hill Police Department and the Mecklenburg County Sheriff's Department shattered his two car windows, dragged him from his car, accosted, tased, and gagged him. Defendants' actions are unequivocally unconstitutional.

The Fourth Circuit specifically intended its opinion in *Armstrong* to clarify constitutional protections of the mentally ill from the gratuitous use of taser weapons by law enforcement and stated:

> Rather than accept this deteriorative creep, we intend this opinion to clarify when taser use amounts to excessive force in, at least, some circumstances. A taser, like "a gun, a baton, . . . or other weapon," *Meyers*, 713 F.3d at 735, is expected to inflict pain or injury when deployed. **It, therefore, may only be deployed when a police officer is confronted with an exigency that creates an immediate safety risk and that is reasonably likely to be cured by using the taser. The subject of a seizure does not create such a risk simply because he is doing something that can be characterized as resistance -- even when that resistance includes physically preventing an officer's manipulations of his body. Erratic behavior and mental illness do not necessarily create a safety risk either. To the contrary, when a seizure is intended solely to prevent a mentally ill individual from harming himself, the officer effecting the seizure has a lessened interest in deploying potentially harmful force**.

*Id*. at 909-910. (emphasis added).

4.    Under *Meyers v. Baltimore County*, Defendants Are Not Entitled to Qualified Immunity for the Multiple Tasings of Marcus While the Officers Laid On Him

Even before *Armstrong*, the Fourth Circuit had established a bright line that the tasing of suspects after they have been secured constitute excessive force in violation of the Fourth Amendment. *See Meyers*, 713 F.3d at 734; *Bailey*, 349 F.3d at 744-45; *see also Armstrong*, 810 F.3d at 908. Qualified immunity is inappropriate here because the officers' (plural) tasings of Marcus occurred after they secured him by laying on top of him as prohibited by *Meyers* and *Bailey*. Tellingly, Defendants do not cite to *Meyers* or *Bailey* in their motions. The physical evidence that Marcus suffered four "crusted puncture lesions" on his chest confirms that two officers deployed their tasers on Marcus in probe mode.  The Virginia State Police statement, however, reports "one South Hill Police officer deployed his Taser." Am. Compl. ¶112. The physical evidence confirms that there was more than one.  At this stage, Plaintiff asserts that Cpl. Parrott and Lt. Zincone were officers present at the scene.  Discovery will identify the identity of the other officer who deployed the taser in probe mode resulting in the other two encrusted lesions on Marcus' chest and his ultimate death.

In *Meyers*, the plaintiff was involved in a fist fight with his brother before police arrived that the scene.  *See Meyers,* 713 F.3d at 727. The 911 operator reported to the officers that a physical altercation had occurred and the operator heard "screaming in the background." *Id.* When the first officer arrived at the scene he observed that the plaintiff's brother's face was lacerated and swollen.  *See id.* The brother notified that officer that the plaintiff was inside the home and the brother "stated that when he arrived at the house that evening, he heard his mother exclaim, 'stop, Ryan.  You are hurting me.'" *Id.* An ensuing fistfight between the brothers caused their mother to call the police.  *See id.*  The brother also advised the officer that the plaintiff "has

problems upstairs and he's bipolar." *Id.* Before entering the home the officer observed that the plaintiff "was pacing inside carrying a baseball bat." *Id.*

In *Meyers*, at the time the officer first deployed his taser in probe mode (for five (5) seconds), the plaintiff had the bat in his hands. *See id.* at 728. The second deployment (for five seconds) caused the plaintiff to drop his bat, however, he remained standing. *See id.* The third deployment (for five seconds) caused the plaintiff to drop to the ground. *See id.* Then three (3) officers got on the plaintiff's back and proceeded to tase the plaintiff seven (7) more times (one (1) probe and six (6) drive stun). *See id.* While the plaintiff was on the ground, he "stiffened up" his body and moved his legs while the officers sat on his back. *See id.*

In *Meyers*, the Fourth Circuit found that while the officer's first three uses of his taser were permissible, that justification had been eliminated after the victim relinquished the baseball bat and fell to the floor. 713 F.3d at 733. The offending officer continued to use his taser seven more times until he had rendered the victim unconscious. *See id.* at 729. The district court determined that the officer's the seven additional taser shocks were inappropriate and concluded that "the Court cannot say as a matter of law that Officer Mee's actions were objectively reasonable." *Id.* at 733-734 (citing *Meyers v. Balt. County*, 814 F. Supp. 2d 552, 560 (D. Md. 2011)). Fourth Circuit agreed with the district court and stated:

> [We] state the conclusion affirmatively. It is an excessive and unreasonable use of force for a police officer repeatedly to administer electrical shocks with a taser on an individual who is no longer armed, has been brought to the ground, has been restrained physically by several other officers and no longer is actively resisting arrest.

*Id. at* 734.

In *Meyers*, the Fourth Circuit held that "officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity." *Id.* The *Meyers* Court further held that

"the fact that the force used in the present case emanated from a taser, rather than from a more traditional device, is not dispositive. The use of **any** 'unnecessary, gratuitous, and disproportionate force,' whether arising from a gun, a baton, a taser or other weapon, precludes an officer from receiving qualified immunity if the subject is unarmed and secured." *Id*. at 734-735 (citing *Park v. Shifflet*, 250 F.3d 843, 852-853 (4th Cir. 2001)(holding that use of pepper spray to subdue an unarmed suspect was irresponsible and excessive when the subject was not a threat to the officer or the public and officer was not entitled to qualified immunity)).

Here, unlike in *Meyers,* Marcus never possessed a weapon. He also had not previously engaged in a fist fight. Defendants are liable under §1983 because they tased Marcus while he was "unarmed and effectively secured" in violation of the bright line test set forth in *Bailey*, 349 F.3d at 744, and confirmed in *Meyers*. 713 F.3d at 734-35. As Plaintiff alleges in her Amended Complaint, the officers laid on him and tased him repeatedly. Am. Compl. ¶¶8-9. As such, all of the tasings were excessive under *Bailey* and *Meyers*. Just as qualified immunity was inappropriate in *Meyers*, so to is it with the officers in this case.

### 5. Defendants' Unnecessary, Gratuitous and Disproportionate Tasing of Marcus Jones Violated a Clearly Established Constitutional Right Established in *Armstrong*, *Bailey* and *Meyers*

In light of the Fourth Circuit's precedent in *Armstrong*, *Bailey* and *Meyers* addressing the use of force on secured and unarmed individuals, a jury could reasonably conclude that the tasing of Marcus violated a constitutional right so clearly established "that every reasonable official [police officer] would have understood that what he [/she][was] doing violated that right." *Wells City of Dearborn Heights*, 538 Fed. Appx. 631, 638 (6th Cir. 2013)(citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011)). Even if "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005).

**F.     Defendants Violated Marcus Jones' Fourteenth Amendment Right to Medical Attention**

"The Fourteenth Amendment Right of pretrial detainees, like the Eighth Amendment right of convicted prisoners requires that government officials not be deliberately indifferent to any serious medical needs of the detainee." *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990). Consequently, pretrial detainees have a "clearly established" right "to medical attention, and prison officials violate detainees' rights to due process when they are deliberately indifferent to serious medical needs." *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir. 1992) (citation omitted); *see also Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

Though Marcus Jones was seized pursuant to an ECO and was not a convicted prisoner, Plaintiff's claim for deprivation of medical care is analyzed under the due process clause of the Fourteenth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *see also Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1998). The due process rights of a pretrial detainee are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983). This means that "while the convicted prisoner is entitled to protection only against punishment that is 'cruel and unusual,' the pretrial detainee may not be subjected to **any** form of punishment." *Martin*, 849 F.2d at 870 (4th Cir. 1998)(emphasis added).

Failure to provide adequate medical care to a detained individual rises to the level of a constitutional violation when there is "deliberate indifference" to an individual's serious medical needs. *See Estelle*, 429 U.S. at 105 ("[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment"). Deliberate indifference is established if the arresting officers were "aware of facts from which the inference could be drawn that a substantial risk of harm exists," and the officers

"must also [have drawn] the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). An officer has the required level of awareness necessary to establish reckless indifference if the detainee's need for medical attention was both "apparent and serious." A medical need is "serious" if it is one that has "been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreeve*, 535 F.3d 225, 241 (4th Cir. 2008). The deprivation of medical care is unconstitutional when it is, "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *See Miller v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). Here, after Defendants seized Marcus, they placed a rag in his mouth. It is simply unconscionable that the officers placed a rag in Marcus' mouth after repeatedly tasing him rather than taking him immediately for medical attention. Plaintiff's Amended Complaint sets forth a claim for the unconstitutional deprivation of medical attention.

### G.      Plaintiff is Entitled to Choose Between Wrongful Death and Survival Claims

Defendants have moved to dismiss Plaintiff's claims brought under the Virginia Survival Act. Defendants appear to misconstrue the interplay between a wrongful death and survival causes of action under Virginia law. Code § 8.01-25, which governs survival of causes of action, states in relevant part:

> Every cause of action whether legal or equitable, which is cognizable in the Commonwealth of Virginia, shall survive either the death of the person against whom the cause of action is or may be asserted, or the death of the person in whose favor the cause of action existed, or the death of both such persons. Provided that in such an action punitive damages shall not be awarded after the death of the party liable for the injury. Provided, further, that if the cause of action asserted by the decedent in his lifetime was for a personal injury and such decedent dies as a result of the injury complained of with a timely action for damages arising from      such injury pending, the action shall be amended in accordance with the provisions of § 8.01-56.

Code § 8.01-56, which is one of Virginia's Death by Wrongful Act statutes, states:

The right of action under § 8.01-50 2 shall not determine, nor the action, when brought, abate by the death, dissolution, or other termination of a defendant; and when a person who has brought an action for personal injury dies pending the action, such action may be revived in the name of his personal representative. If death resulted from the injury for which the action was originally brought, a motion for judgment and other pleadings shall be amended so as to conform to an action under § 8.01-50, and the case proceeded with as if the action had been brought under such section. In such cases, however, there shall be but one recovery for the same injury.

It is well settled that a plaintiff cannot recover for both wrongful death and survival claims because there "shall be but one recovery for the same injury." *Hendrix v. Daugherty*, 249 Va. 540, 542, 457 S.E.2d 71, 73 (1995)("The plain language contained in Code §§ 8.01-25 and -56 unequivocally mandates that a person may not recover for the same injury under the survival statute and the wrongful death statute. There can be but one recovery."). The Virginia Supreme Court has instructed that "at an appropriate time ***after discovery has been completed***, the plaintiffs must be required to elect whether they will proceed" under a wrongful death action or breached a duty owed to the plaintiffs in the prosecution of the survival action. *Id.* Because discovery has not completed, Plaintff does not have to make an election between pursuing wrongful death damages or survival damages.

**H.      Defendants Premise Their Motion to Dismiss on Their Own Version of the Facts.**

Defendants' Motion to Dismiss is premised on their own self-serving assertions about the facts in this case. The Court is not permitted to accept the Defendants' mischaracterization of the facts to conclude that Plaintiff has not stated a civil rights claim under Rule 12.  There are additional non-verified "facts" the Defendants claim serve as a basis to dismiss Plaintiff's Section 1983 claim.

Defendants assert without any factual support that Marcus "posed a substantial risk to himself and the community at large" and that they had "no way of knowing whether Jones was

unarmed while he remained in his vehicle." Defendants then backtrack from their "factual assertions" that and acknowledge that there was only a "possibility" of "immediate harm." Mem. at 12. Defendants also concede that it was "unclear" to them whether Marcus was "armed." *Id*. at 13. Even if these "facts" were verified, the Court cannot accept them as a basis to conclude that Plaintiff has not stated a claim under Rule 12(b)(6). Yet, none of these equivocations provide Defendants the liberty to obliterate the pronouncements in *Armstrong* to "de-escalate" encounters with the mentally ill and that the use of force in those situations is "quite limited."

"If merely acting strangely in such a circumstance served as a green light to taser deployment, it would then be the rule rather than the exception when law enforcement officials encounter the mentally ill. That cannot be." *Armstrong*, 810 F.3d at 906. As stated in the Amended Complaint, Plaintiff predicted that Defendants would allege that Marcus "posed a risk of immediate danger" to others. Mem. of Law at 14. That is the textbook response in §1983 cases where officers kill unarmed citizens with excessive force in violation of the United States Constitution. Marcus was confined to the interior of his own vehicle, surrounded by the officers' vehicles and when he began "kicking and punching the inside of the Camaro." He was alone and certainly not hurting anyone. As Plaintiff asserted in her Amended Complaint, "No credible, truthful or honest police officer could claim to be physically threatened while standing safely outside his vehicle." Am. Compl. ¶110; *cf. Armstrong*, 810 F.3d at 910 ("The subject seizure does not create a risk simply because he is doing something that can be characterized as resistance….Erratic behavior and mental illness do not necessarily create a safety risk either."). These arguments about concerns for their own safety themselves create issues of fact about their credibility which would preclude the grant of summary judgment, let alone a motion to dismiss. Plaintiff is entitled to discovery, particularly the testimony of the offending officers.

## I.      Plaintiff Sets Forth an Adequate Deprivation of Life and Liberty Claim

Plaintiff's §1983 claim is based on Defendants' excessive force in violation of the bright lines articulated in *Bailey*, *Meyers* and *Armstrong*. Plaintiff does not allege the ECO was unlawful. She asserts the manner in which Defendants executed it violated Marcus' constitutional rights.

## J.      Plaintiff States a Plausible False Arrest Claim

"The right of the people to be secure in their persons. . . against unreasonable . . .seizures, shall not be violated." U.S. Const. amend. IV. "'False arrest' is shorthand for an unreasonable seizure prohibited by the Fourth Amendment." *Gonzalez v. Vill. of W. Milwaukee*, 671 F.3d 649, 655 (7th Cir. 2012); *see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "In a long line of cases, [the Supreme Court] ha[s] said that when an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt. The arrest is constitutionally reasonable." *Virginia v. Moore*, 553 U.S. 164, 171 (2008). As stated above, Plaintiff's false arrest claims emanate from her claims involving the Defendants' unconstitutional mistreatment in the seizing of Marcus.

## IV.    CONCLUSION

For the reasons set forth herein, Plaintiff Violet A. Smith, as Administrator of the Estate of Sabin Marcus Jones, deceased, respectfully requests that this Court deny Defendants Cpl. Chris Parrott and Lt. Scott Zincone's Motion to Dismiss Plaintiff's Amended Complaint.

Respectfully submitted,

By:    */s/ William H. O'Brien*
       **DOUMMAR & O'BRIEN**
       William H. O'Brien
       Counsel for Plaintiff
       1397 Laskin Road
       Virginia Beach, VA  23451
       happy@doummarandobrien.com
       Telephone 757-422-0061
       Fax 757-422-5512

## CERTIFICATE OF SERVICE

I certify that on June 17, 2019, I electronically filed the foregoing with the Clerk of the court using the ECF system, which will send notice of this filing to:

Carlene Booth Johnson, Esquire
Perry Law Firm, A Professional Corporation
262 Chellowe Road
Dillwyn, VA 23936
Perrylawfirm@hughes.net

David P. Corrigan, Esquire
Leslie A. Winneberger, Esquire
Saemi Murphy, Esquire
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, VA  23255
dcorrigan@hccw.com
lwinneberger@hccw.com
smurphy@hccw.com

By:     */s/ William H. O'Brien*
DOUMMAR & O'BRIEN
William H. O'Brien
Counsel for Plaintiff
1397 Laskin Road
Virginia Beach, VA  23451
happy@doummarandobrien.com
Telephone 757-422-0061
Fax 757-422-5512