**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**VIOLET A. SMITH,** *as administrator of
the estate of Sabin Marcus Jones, deceased*,

        **Plaintiff,**

**v.**                                 **Civil Action No. 3:19cv46**

**TOWN OF SOUTH HILL,** *et al.*,

        **Defendants.**

**<u>MEMORANDUM OPINION</u>**

This matter comes before the Court on four motions:

(1)      Defendants Mecklenburg County Sheriff's Department, Sheriff R.W. Hawkins, and Deputy Sheriff Major Terry Edmonds, Investigator B.J. Mull, Davis Cumbia, Troy Walker, and Bruce King's (collectively, the "Sheriff Defendants") Motion to Dismiss (the "Sheriff Defendants Motion to Dismiss"), (ECF No. 25);

(2)      Defendant Officer Michael Watters's ("Officer Watters") Motion to Dismiss (the "Officer Watters Motion to Dismiss"), (ECF No. 27);

(3)      Defendants Corporal Chris Parrott ("Corporal Parrott") and Lieutenant Scott Zincone's ("Lieutenant Zincone") Motion to Dismiss (the "Parrott and Zincone Motion to Dismiss"), (ECF No. 29); and,

(4)      Defendants South Hill Police Department, Town of South Hill, and Chief of Police Stuart Bowen's[1] (collectively, the "South Hill Defendants") Motion to Dismiss (the "South Hill Defendants Motion to Dismiss), (ECF No. 31).

---

[1] The Court will refer to Defendants Chief of Police Stuart Bowen; Sheriff R.W. "Bobby" Hawkins, Jr.; Officer Watters; Corporal Parrott; Investigator B.J. Mull; Lieutenant Zincone; Davis Cumbia; Deputy Sheriff Major Terry Edmonds; Troy Walker; and, Bruce King as the "Individual Defendants."

The Court will refer to all thirty-three Defendants, which includes the twenty unnamed police officers, collectively as "Defendants."

Plaintiff Violet A. Smith, in her capacity as the administrator of the estate of Sabin Marcus Jones, responded to each of the Motions to Dismiss, (ECF Nos. 33–36), and the Defendants responded, (ECF Nos. 37–40).

These matters are ripe for adjudication. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331(a).[2] For the reasons that follow, the Court will grant the Sheriff Defendants Motion to Dismiss; the Parrott and Zincone Motion to Dismiss; and, the South Hill Defendants Motion to Dismiss. The Court will also grant in part and deny in part the Officer Watters Motion to Dismiss. The Court will allow only Smith's § 1983 excessive force claim to continue against Officer Watters in his individual capacity.

---

[2] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331(a). Smith brings her claims under 42 U.S.C. §§ 1983 and 1985.

# I. Factual and Procedural Background

## A. Factual Background[3]

Smith brings this civil rights action pursuant to 42 U.S.C. §§ 1983[4] and 1985(3)[5] against

thirty-three defendants, including twenty unnamed police officers "whose identities are currently

---

[3] Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). For the purpose of the Rule 12(b)(6) Motion to Dismiss, "a court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 440 (4th Cir. 2011)).

[4] Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, . . . injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.

[5] Although Smith does not specify which subsection of § 1985 supports her claim, only subsection (3) could possibly apply because Smith does not allege that any person prevented an officer from performing duties, (42 U.S.C. § 1985(1)), or that obstruction of justice, intimidation of a party, witness, or juror occurred, (42 U.S.C. § 1985(2)). Therefore, the Court will look to subsection (3), which provides:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

known by Defendants but unknown by" Smith. (Am. Compl. ¶ 36, ECF No. 23.) Smith's claims arise from the death of Sabin Marcus Jones, a mentally ill individual who died after being tased by Officer Watters, and perhaps others, while members of the Mecklenburg County Sheriff's Department and the South Hill Police Department attempted to take Jones into custody pursuant to an Emergency Custody Order issued by a Virginia magistrate based upon the affidavit of Jones's aunt.

In the Amended Complaint, which contains numerous legal conclusions and arguments, Smith explains that on December 29, 2016, Jones "had been admitted to the Virginia Beach Psychiatric Center." (Am. Compl. ¶ 79.) Approximately one week later, on January 6, 2017, Jones "was discharged." (*Id.* ¶ 80.) Two weeks later, on January 20, 2017, Jones's aunt Sheila Holmes "determined [that] her nephew had not been taking his prescribed medications." (*Id.* ¶ 81.) At 10:50 a.m. on that day, Holmes "went to the South Hill Police Department to request that they place [Jones] in custody under an Emergency Custody Order." (*Id.*) Smith posits that Jones's "mental status and mental illness had been long known to the South Hill Police." (*Id.* ¶ 82.)

"The South Hill Police went to pick up [Jones] at his house . . . but he was not there." (*Id.* ¶ 83.) Approximately three hours after she had requested the Emergency Custody Order, at 2:00 p.m., Holmes found Jones "parked at the EZ Convenient Stop store in South Hill and called the police." (*Id.* ¶ 84.)

Within fifteen minutes, at 2:15 p.m., "eight police officers from the South Hill Police Department and the Mecklenburg County Sheriff's Office found [Jones] still in his parked car at the EZ Convenient Stop." (*Id.* ¶ 85.) The officers "walked up to the car and [Jones] turned his car on to drive away." (*Id.* ¶ 86.) "Two officers blocked his vehicle with their cruisers." (*Id.*

¶ 87.)  "Two South Hill officers instructed [Jones] to get out of the car but he refused."  (*Id.*

¶ 88.)  Smith asserts that Jones "was unarmed and contained within his vehicle and posed no

danger to the officers who outnumbered him."  (*Id.* ¶ 90.)

"[A]n officer then broke the driver's side window."  (*Id.* ¶ 92.)  Jones "moved to the

passenger side of the vehicle."  (*Id.* ¶ 93.)  "A second officer then broke the passenger side

window and opened the door and removed him from the vehicle."  (*Id.* ¶ 94.)

"Officers had removed their guns" but Holmes "hollered at them, 'Don't shoot him!

He's off his medication and you guys know his situation.'"  (*Id.* ¶ 95.)  "Then the officers put

their guns away and took out their tasers."  (*Id.* ¶ 96.)

"The officers attempted to get [Jones] on the ground and they tased him multiple times."

(*Id.* ¶ 97.)  "Officer Wat[t]ers deployed his taser[6] and struck Jones in the chest."  (*Id.* ¶ 98.)

Holmes "observed [Jones's] eyeballs rolling into the back of his head."  (*Id.* ¶ 100.)  Smith

asserts that "[t]he officers continued to tase [Jones] as he was pinned to the pavement."  (*Id.*

¶ 101.)  "While [Jones] was laying on the ground, a police officer retrieved a rag from his vehicle

and placed [it] in [Jones's] mouth."  (*Id.* ¶ 102.)  "As [Jones] groaned, an officer yelled, 'Do you

want to do this?'"  (*Id.* ¶ 103.)  "While on the ground, [Jones] became non[]responsive."

(*Id.* ¶ 104.)

---

[6] The United States Court of Appeals for the Fourth Circuit has explained that "[t]asers generally have two modes."  *Estate of Armstrong v. Village of Pinehurst*, 810 F.3d 892, 897 n.3 (4th Cir. 2016).  First, "[i]n dart mode, a taser shoots probes into a subject and overrides the central nervous system."  *Id.* (quoting *Estate of Booker v. Gomez*, 745 F.3d 405, 414 n.10 (10th Cir. 2014)).  Second, "[d]rive stun mode, on the other hand, 'does not cause an override of the victim's central nervous system'; that mode 'is used as a pain compliance tool with limited threat reduction.'"  *Id.* (internal quotation marks and citations omitted).

Although it does not affect the Court's analysis, Smith states that "[t]he probes from the officers' taser weapons made full contact with [Jones] resulting in four 'encrusted lesions' in his right and left chest."  (Am. Compl. ¶ 11.)  Reading these allegations favorably to Smith, this allegation suggests that Officer Watters deployed his taser in dart mode.

After Jones became non responsive, an unidentified officer put him "into the back of a police van and took him to the hospital." (*Id.* ¶ 105.) "Major Edwards[7] called . . . Holmes three times and told her to meet [them] at the hospital." (*Id.* ¶ 106.)

Once at the hospital, the officers advised Holmes that "[Jones] had died on the way to the hospital." (*Id.* ¶ 107.) However, after being transported to a different hospital, Jones "was placed on a ventilator for [five] days and ultimately died on January 24, 2017." (*Id.* ¶ 109.)

Smith includes an excerpt from the pathologist/medical examiner's report, which includes his findings from the autopsy. (*Id.* ¶ 110.) The pathologist listed Jones's cause of death as "[c]omplications of anoxic brain injury due to excited delirium syndrome associated with schizophrenia, physical exertion and conducted electrical weapon use." (*Id.* ¶ 111 (emphasis omitted).)

Smith also quotes from the report following the Virginia State Police's investigation (the "Police Report"), saying:

> At approximately 2:40 p.m. Friday, the Mecklenburg County Sheriff's Office was following up on an Emergency Custody Order . . . requested by a family member for Sabin M. Jones, 44, of South Hill, Va. A family member advised the deputies that Jones was at a convenience store/gas station in the 800 block of North Mecklenburg Avenue in the town of South Hill. The deputies located Jones inside a late[]model Chevrolet Camaro at the convenience store/gas station. When the deputies approached him to serve the [Emergency Custody Order], he refused to exit his vehicle. He backed into one of the deputies' vehicles and then began driving forward, at which time additional deputies, with the assistance of South Hill Police, were able to block the Camaro from leaving the parking lot. Despite the deputies' and officers' repeated attempts to talk to Jones and have him exit his locked vehicle, he refused and became increasingly agitated. To prevent Jones from harming himself inside the vehicle, a deputy broke open one of the vehicle's windows and negotiations continued with Jones in an attempt to calm him down and get him to safely exit the Camaro. When Jones began kicking and punching the inside of the Camaro, a deputy broke open a second window on the car. Jones then exited the vehicle in an aggressive manner towards the deputies and officers.

---

[7] As explained below, Smith does not name a Major Edwards as a defendant in this matter. Because the Court must "draw all reasonable inferences in favor of" Smith, the Court will presume that Smith meant to say Major *Edmonds*. *Kensington*, 684 F.3d at 467.

As the deputies and officers attempted to apprehend Jones, he became increasingly combative. One of the South Hill Police Officers deployed his Taser to bring Jones under control. After the deployment, Jones remained noncompliant with the deputies' and officers' commands as they attempted to handcuff him. Jones also began banging his head against the ground. Due to Jones'[s] heightened state of agitation and contact with the Taser, he was transported to VCU Health Community Hospital in South Hill. The hospital then transferred Jones to the VCU Medical Center in Richmond, where he passed away Tuesday, Jan. 24, 2017. His remains were transported to the Office of the Chief Medical Examiner in Richmond for autopsy and examination. At the request of Mecklenburg County Sheriff R.W. "Bobby" Hawkins Jr. and South Hill Police Chief Stuart Bowen, the Virginia State Police is investigating the incident. The investigation remains ongoing at this time.[8]

(*Id.* ¶ 112.)

### B.    Procedural Background

Smith originally filed suit in this Court. The Defendants then each moved to dismiss and, in response, Smith filed the Amended Complaint as a matter of right.

---

[8] Smith did not attach a copy of the Police Report to the Amended Complaint. Smith, however, appears to accept the truth of the statements made in the Virginia State Police's report. She quotes from it and, in the Amended Complaint, argues that "[t]he Virginia State Police's press release confirms several constitutional violations." (Am. Compl. ¶ 113.)

The Court recognizes that when a document is "prepared by or for the defendant" the document "may reflect the defendant's version of contested events or contain self[]serving, exculpatory statements that are unlikely to have been adopted by the plaintiff." *Goines v. Valley Comty. Servs. Bd.*, 822 F.3d 159, 168 (4th Cir. 2016). Similarly, the Court notes that "if a plaintiff attaches or references a report prepared by a third[]party to show how he [or she] learned of certain facts alleged in his [or her] complaint, he [or she] does not automatically adopt all of the factual conclusions contained in the report." *Id.* at 167 (citing *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1134 (D.C. Cir. 2015)).

Because many of the allegations in the Police Report align with Smith's factual allegations (although she adds allegations not contained in the report), the Court will assume the truth of those allegations in the Police Report. However, given that the Virginia State Police—a law enforcement entity with close ties to the law enforcement entities who are Defendants in this case—prepared the Police Report, it is possible that the Police Report contains "self[]serving, exculpatory statements that are unlikely to have been adopted by" Smith. *Id.* at 168. Therefore, because the Court "must accept as true all of the factual allegations contained in the" Amended Complaint, the Court will assume the truth of the statements in Smith's Amended Complaint and will not assume as true those factual allegations in the Police Report that conflict with the facts as Smith relates them. *Kensington*, 684 F.3d at 467.

Smith brings six counts in the Amended Complaint:

**Count I:** Deprivation of Civil Rights, in violation of 42 U.S.C. §§ 1983 and 1985, the Fourth Amendment, and the Fourteenth Amendment. Smith brings Count I against all Defendants and states that "[t]he unconstitutional actions of Defendants include, but are not limited to, the use of excessive and/or unreasonable force, the deprivation of medical care, [and] the deprivation of Marcus Jones'[s] life and physical liberty." (Am. Compl. ¶ 143.)

**Count II:** Survival Action, pursuant to Virginia Code § 8.01-25. Smith brings Count II against all Defendants and avers that she "is entitled to relief under the Virginia Code § 8.01-25 for the Defendants['] violations of" 42 U.S.C. §§ 1983 and 1985. (*Id.* ¶ 155.)

**Count III:** Wrongful Death, pursuant to Virginia Code § 8.01-25. Smith brings Count III against all Defendants and states that she "is entitled to relief under the Wrongful Death Statute for the Defendants['] violations of" 42 U.S.C. §§ 1983 and 1985." (*Id.* ¶ 161.)

**Count IV:** Excessive Force/Police Brutality, in violation of the Fourth and Fourteenth Amendment. Smith brings Count IV against all Defendants and states that "[a]s a direct, substantial and proximate result of the intentional, willful, malicious and/or otherwise tortious conduct of Defendants, Marcus Jones was deprived of his civil rights under the Fourth and Fourteenth Amendments to the United States Constitution." (*Id.* ¶ 168.)

**Count V:** Unconstitutional/Inadequate Policies, Training, and Procedures, in violation of 42 U.S.C. § 1983. Smith brings Count V against Mecklenburg County Sheriff R.W. "Bobby" Hawkins, Jr.; South Hill Police Chief Stuart Bowen; the South Hill Police Department; and the Mecklenburg County Sheriff's Department. Smith alleges that these Defendants' "failure [to] properly train the officers on the meaning, significance[,] and requirements of the Fourth Circuit's *Armstrong* holding constitutes . . . reckless indifference to the rights of citizens in Virginia, including Marcus Jones." (*Id.* ¶ 174.)

**Count VI:** False Arrest, in violation of the Fourth Amendment. Smith brings Count VI against all Defendants and states that "[t]he actions of Defendants South Hill Police Officers and Mecklenburg County Sheriff's Department Officers constitutes an unreasonable seizure prohibited by the Fourth Amendment." (*Id.* ¶ 184.)

In response to the Amended Complaint, Defendants filed the instant Motions to Dismiss, seeking to dismiss all of the counts in the Amended Complaint. Smith responded and Defendants replied. The Court now turns to the merits of the pending motions.

## II.  Standard of Review:  Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).  To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief.").  Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough.  *Twombly*, 550 U.S. at 555.  Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief."  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged.  *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This analysis is context specific and requires "the reviewing court to draw on its judicial experience and common sense."  *Francis*, 588 F.3d at 193.  The Court must assume all well pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief."  *Iqbal*, 556 U.S. at 678–79; *see also Kensington*, 684 F.3d at 467 (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of

the plaintiff'" (quoting *Kolon Indus., Inc.*, 637 F.3d at 440)).  This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

### III.  Analysis[9]

The Amended Complaint brings six counts against thirty-three Defendants.  Aside from Count V—which Smith brings against a subset of Defendants—Smith brings each of the counts in the Amended Complaint against all Defendants and does not specify the basis for holding each Defendant liable, whether it be for their own actions or on the basis of supervisory or municipality liability.  Therefore, rather than addressing each count individually, the Court will address each of Smith's broad contentions.

The Court will begin by dismissing two broad sets of claims:  (1) the claims against the South Hill Police Department; and, (2) the official capacity claims against the Individual Defendants.  The Court will then turn to the only claim that survives the instant Motions to Dismiss, Smith's § 1983 excessive force claim against Officer Watters.  Finally, the Court will

---

[9] In the Amended Complaint, Smith states that she "was appointed Administrator of the Estate of Marcus Sabin Jones by the Clerk's Office for the Circuit Court of Mecklenburg County under Va. Code § 8.01-50 on April 3, 2017." (Am. Compl. ¶ 49.)  To support this contention, Smith asserts that she attached Exhibit A to the Amended Complaint.  (*See id.*)  As the Sheriff Defendants point out, Smith did not attach an Exhibit A to the Amended Complaint.  Therefore, the Sheriff Defendants challenge Smith's standing to bring this case.  No other Defendant challenges Smith's standing and—recognizing that Smith attached the correct exhibit, (ECF No. 1-2), to her original Complaint, (ECF No. 1)—the Sheriff Defendants also make arguments assuming that Smith has standing.

The document that Smith attached to her original Complaint shows that the Circuit Court for Mecklenburg County designated Smith as the administrator of Jones's estate.  (*See* ECF No. 1-2.)  Although Smith did not attach this document to the Amended Complaint, because it appears on the Court's docket and each of the Defendants received notice of it (as evidenced by their lack of argument regarding Smith's ability to bring this case and the Sheriff Defendants additional arguments), the Court will deny the Sheriff Defendants Motion to Dismiss on this ground.  The Court will direct the Clerk to attach ECF No. 1-2 to the Amended Complaint.

address Smith's remaining claims, including: (1) the excessive force claim against the remaining Defendants; (2) the §1983 deprivation of medical care claim; (3) the § 1985 conspiracy claim; (4) the false arrest claim; (5) the survival action/wrongful death action claims; and, (6) Smith's request for injunctive relief.

### A. The Court Will Dismiss Smith's Claims Against the South Hill Police Department

The Court begins by dismissing all of Smith's claims against the South Hill Police Department because it is not an entity that can be sued separately from the Town of South Hill.

Smith brings all of her claims against the South Hill Police Department, claiming that the "South Hill Police Department is sui generis[10] with the Town of South Hill." (Am. Compl. ¶ 59.) The South Hill Defendants state that "the South Hill Police Department is *non sui juris*[11] and therefore, lacks the capacity to be sued" and requests that the Court dismiss the South Hill Police Department as a defendant on that basis. (Mem. Supp. South Hill Defs. Mot. Dismiss 6, ECF No. 32 (emphasis in original).) In response, Smith states that "[t]o the extent that the Town of South Hill acknowledges that it is responsible for any judgment arising from the tortious conduct of the South Hill Police Department and/or officers of the South Hill Police Department, [Smith] does not oppose amending the caption to reflect that the Town of South Hill is the responsible party." (Resp. South Hill Defs. Mot. Dismiss 31, ECF No. 33.) The Town of South Hill "will not acknowledge any liability in this case," but argues that the South Hill Police Department must be dismissed from this matter. (Reply South Hill Defs. Mot. Dismiss 1 n.1, ECF No. 37.)

---

[10] Sui generis means "[o]f its own kind or class; unique or peculiar." *Sui Generis*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[11] Non sui juris means "not of one's own right; [l]acking legal age or capacity." *Non Sui Juris*, BLACK'S LAW DICTIONARY (11th ed. 2019).

"Where a party is neither an individual nor a corporation, the party's capacity to be sued is determined by the law of the state where the federal district court sits." *Mukana v. Gibson*, No. 1:11cv493, 2011 WL 3793336, at *5 n.2 (E.D. Va. Aug. 25, 2011) (citing Fed. R. Civ. P. 17(b)(3); *Thompson v. City of Danville*, No. 4:10cv12, 2011 WL 2174536 (W.D. Va. June 3, 2011)). "Under Virginia law, which applies in this context, 'an operating division of a governmental entity . . . cannot be sued unless the legislature has vested the operating division with the capacity to be sued.'" *Id.* at *5 (quoting *Guerrero v. Deane*, No. 1:09cv1313, 2010 WL 670089, at *17 (E.D. Va. Feb. 19, 2010)). Courts have previously concluded that "nothing in Virginia law recognizes municipal police departments as entities separate from their respective municipalities." *Hearn v. Hudson*, 549 F. Supp. 949, 952 n. 1 (W.D. Va. Apr. 23, 1982) (dismissing claims against a municipal police department); *see, e.g.*, *Lucas v. Henrico Pub. Sch. Bd.*, No. 3:18cv402, 2019 WL 5791343, at *3 (E.D. Va. Nov. 6, 2019) (stating that "several courts in this Circuit have dismissed claims against police departments in Virginia, holding that they lack the capacity to be sued" and dismissing the plaintiff's claims against a municipal police department).

No Virginia statute or regulation allows the South Hill Police Department to be sued separately from the Town of South Hill. Therefore, the Court will dismiss all claims against the South Hill Police Department and will dismiss the South Hill Police Department as a defendant in this matter. *See Hearn*, 549 F. Supp. at 952 n.1; *Lucas*, 2019 WL 5791341, at *3.

B.     **The Court Will Dismiss Smith's Official Capacity Claims Against the Individual Defendants**

Having dismissed all claims against the South Hill Police Department, the Court now turns to Smith's official capacity claims against the Individual Defendants, which the Court will dismiss.

Smith brings each of her claims against the Individual Defendants in their individual and official capacities. (Am. Compl. ¶ 52.) In their respective Motions to Dismiss, each Individual Defendant moves to dismiss the claims brought against them in his or her official capacity. The Sheriff Defendants move to dismiss the official capacity claims on the ground that the Eleventh Amendment bars the claims. Officer Watters, Corporal Parrott, Lieutenant Zincone, and Stuart Bowen move to dismiss the official capacity claims as redundant of Smith's claim against the municipality, the Town of South Hill. In her responses, Smith states that it would be premature to dismiss these official capacity claims. The Court will address each ground in turn.

1.     **Because the Eleventh Amendment Bars Official Capacity Claims, the Court Will Dismiss All Claims Against the Individual Sheriff Defendants in Their Official Capacity**

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. "[A]bsent waiver by a State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court." *Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (citing *Ford Motor Co. v. Dep't of Treasury of Ind.*, 323 U.S. 459, 464 (1945)). "This bar remains in effect when State officials are sued for damages in their official capacity." *Id.* (citations omitted). The Supreme Court of the United States "has held that § 1983 was not intended to abrogate a State's Eleventh Amendment immunity." *Id.* at 169 n.17. Specifically, "[t]here is considerable authority holding that the Eleventh Amendment precludes § 1983 official[]capacity suits against Virginia Sheriffs and their deputies because they are state, not local, officials." *Gemaehlich v. Johnson*, No. 7:12cv263, 2013 WL 589234, at *4 (W.D. Va.

Feb. 14, 2013) (citing cases and dismissing the plaintiff's claims against a Virginia sheriff and her deputies as barred by the Eleventh Amendment).

Because the Eleventh Amendment bars Smith's official capacity claims against the individual Sheriff Defendants,[12] the Court will dismiss all of Smith's counts brought against the individual Sheriff Defendants in their official capacities.[13]  *See id.*  The Court will address Smith's claims against the individual Sheriff Defendants in their personal capacities below.

---

[12] The individual Sheriff Defendants are Sheriff R.W. "Bobby" Hawkins, Deputy Sheriff Major Terry Edmunds, Investigator B.J. Mull, Davis Cumbia, Troy Walker, and Bruce King.

[13] As explained below, in the Amended Complaint, Smith seeks prospective injunctive relief "to correct government procedure to prevent future injury." (Am. Compl. 29.)  Under the *Ex Parte Young* exception to Eleventh Amendment immunity, such injunctive relief may allow Smith's claim against the individual Sheriff Defendants.  *See Ex Parte Young*, 209 U.S. 123 (1908).  "The *Ex Parte Young* exception to the Eleventh Amendment 'allows private citizens, in proper cases, to petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution or a federal statute.'"  *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 746 (4th Cir. 2018) (quoting *Antrican v. Odom*, 290 F.3d 178, 184 (4th Cir. 2002)).  "Under this exception, a state official who acts in violation of federal law is 'stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct."  *Id.* at 746–47 (quoting *Ex Parte Young*, 209 U.S. at 160).  "By subjecting a state official to a legal action, the *Ex Parte Young* exception seeks to 'conform [his or her] future conduct to the requirements of federal law, even though such an injunction may have an ancillary effect on the state treasury."  *Id.* at 747 (quoting *Quern v. Jordan*, 440 U.S. 332, 337 (1979)).
Here, neither Smith nor the Sheriff Defendants cite the *Ex Parte Young* exception. However, the Sheriff Defendants argue that Smiths's "cryptic reference to injunctive relief at the end of the Amended Complaint, just as in the Complaint, [does not] evade Eleventh Amendment immunity," hinting at such a concept.  (Mem. Supp. Sheriff Defs. Mot. Dismiss 9.)
Although Smith seeks prospective injunctive relief that may overcome the individual Sheriff Defendants' Eleventh Amendment immunity the Court need not address such a possibility.  As explained below, the Court will dismiss Smith's request for such relief because Jones is deceased and cannot benefit from the prospective injunctive relief Smith seeks. As such, the Court need not address whether such prospective injunctive relief overcomes the individual Sheriff Defendants' Eleventh Amendment immunity.

### 2. Because They Are Redundant of Smith's Claims Against the Town of South Hill, the Court Will Dismiss the Official Capacity Claims Against the Town of South Hill Individual Defendants

Similar to her official capacity claims against the individual Sheriff Defendants, the Court will also dismiss Smith's official capacity claims against the individual South Hill Defendants.[14]

"Official[]capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Graham*, 473 U.S. at 165 (quoting *Monell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658, 690 n. 55 (1978)). "As long as the government entity receives notice and an opportunity to respond, an official[]capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* (citations omitted).

Here, Smith brings her claims against both the Town of South Hill and the individual South Hill Defendants in their official capacities as employees of the Town of South Hill. The Town of South Hill, the entity that employs each of the individual South Hill Defendants, clearly has received notice of this matter because it has moved to dismiss the case against it in the South Hill Defendants Motion to Dismiss. Because Smith's official capacity claims against the individual South Hill Defendants are redundant of her claims against the Town of South Hill, the Court will dismiss all counts against the individual South Hill Defendants brought against them in their official capacities.[15] *See id.* The Court will address Smith's claims against the individual South Hill Defendants in their personal capacities below.

---

[14] The individual South Hill Defendants include: Officer Watters; Corporal Parrott; Lieutenant Zincone; and, Chief of Police Stuart Bowen.

[15] In their Motion to Dismiss, the South Hill Defendants request that the Court dismiss Smith's request for punitive damages against the South Hill Defendants for their actions taken in their official capacities. (Mem. Supp. South Hill Defs. Mot. Dismiss 30.) Because the Court will dismiss the official capacity claims against the South Hill Defendants, the Court necessarily

### C.     Smith's § 1983 Excessive Force Claim

In Count I, Smith brings a § 1983 excessive force claim against all Defendants.[16] Because the analysis is different for Officer Watters—the only named officer who Smith alleges tased Jones—the Court will first address the excessive force claim as to Officer Watters. The Court will then address the claim against Chief of Police Stuart Bowen, Officer Watters's supervisor, and the Town of South Hill, the municipality that employs Officer Watters. Finally, the Court will address the claim as to the remaining Defendants.

### 1.     Applicable Legal Standards

"To succeed on a § 1983 claim, a plaintiff must prove by a preponderance of the evidence that: (1) the defendant engaged in conduct which deprived plaintiff of a federal constitutional or statutory right, (2) that the defendant was acting under color of law, and (3) that the acts of that defendant proximately caused the plaintiff's damages." *Daniczek v. Spencer*, 156 F. Supp. 3d 739, 747 (E.D. Va. 2016) (citing *Amato v. City of Richmond*, 875 F. Supp. 1124, 1132–33 (E.D. Va. 1994)).

As to the first prong of the § 1983 test, Smith alleges that Defendants "deprived" Jones of his Fourth Amendment rights when they used excessive force that led to his death. Smith focuses on Defendants', specifically Officer Watters', use of the taser when trying to take Jones

---

will dismiss Smith's claim for punitive damages against the South Hill Defendants in their official capacity.

[16] Smith entitled Count IV as "Excessive Force/Police Brutality." (Am. Compl. 24 (capitalization omitted).) Similar to Count I, she brings Count IV against all Defendants. (*Id.*) Smith cites the Fourth and Fourteenth Amendments as the only legal basis for Count IV. (*Id.* ¶ 168.) Because 42 U.S.C. § 1983 provides the means for an individual to recover for a violation of his or her civil rights taken by another individual who acted under the color of state law, the Court will dismiss Count IV as duplicative of Count I.

into custody. The United States Court of Appeals for the Fourth Circuit has recently spoken on this issue in *Estate of Armstrong v. Village of Pinehurst*, 810 F.3d 892 (4th Cir. 2016).[17]

### a. *Armstrong* Case Summary

Because Jones's situation closely mirrors the situation confronted by the Fourth Circuit in *Armstrong* and because Smith relies heavily on that case in both her Amended Complaint and her Responses to the Motion to Dismiss, the Court provides a detailed case summary of *Armstrong* here.

In *Armstrong*, the Fourth Circuit reversed the district court's grant of summary judgment to the defendants and ruled in favor of the plaintiff—as administrator of Armstrong's estate—on her § 1983 excessive force claim.

Armstrong's sister had taken Armstrong—a person who suffered from bipolar disorder and paranoid schizophrenia—to the hospital after she noticed that he had not taken his prescribed medication. *Armstrong*, 810 F.3d at 896. Although Armstrong checked into the hospital, he later "eloped from the [emergency department]" and the police were called. *Id.* The examining doctor "judged Armstrong a danger to himself and issued involuntary commitment papers to compel his return." *Id.* When issuing the involuntary commitment papers, the doctor checked only the box that indicated that Armstrong was a threat to himself, although in a separate box he could have designated that Armstrong was also a danger to others. *Id.*[18]

---

[17] In May 2019, the Fourth Circuit once again spoke on the use of tasers. *See Brooks v. Johnson*, 924 F.3d 104 (4th Cir. 2019). However, *Johnson* involved an excessive force claim brought by an inmate against a prison guard for the guard's alleged actions taken against the inmate in while the jail. *Id.* at 109. The Fourth Circuit, therefore, analyzed the inmate's claim under the Eighth Amendment of the United States Constitution. *Id.* at 112. Because the legal standard utilized in *Johnson* is different than that applicable to this case, the Court will proceed under the *Armstrong* standard.

[18] The Sheriff Defendants submitted with their Motion to Dismiss a copy of the involuntary commitment papers at issue in *Armstrong*. (ECF No. 26-3.) Although the document

When the officers arrived, the involuntary commitment papers had not been finalized because, under North Carolina law, they needed to be notarized. *Id.* The officers found Armstrong wandering "across an active roadway." *Id.* An officer "successfully convinced" Armstrong to come to the side of the road, but Armstrong "then proceeded to eat grass and dandelions, chew on a gauze[]like substance, and put cigarettes out on his tongue." *Id.* "As soon as they learned that the commitment papers were complete, the three police officers surrounded and advanced toward Armstrong—who reacted by sitting down and wrapping himself around a four[]by[]four post that was supporting a nearby stop sign." *Id.* Although six people surrounded Armstrong, they could not remove Armstrong from the stop sign. *Id.* at 896–97.

"[J]ust thirty seconds or so after the officers told Armstrong his commitment order was final, [one officer] instructed [another officer] to prepare to tase Armstrong." *Id.* at 897. After an unheeded warning, the officer "deployed the taser [against Armstrong]—five separate times over a period of approximately two minutes." *Id.* "Rather than have its desired effect, the tasing actually increased Armstrong's resistance." *Id.* After the tasing ceased, a group of five people managed to remove Armstrong from the pole and "laid him facedown on the ground." *Id.*

The individuals then "restrained" Armstrong with two individuals "placing a knee on his back and standing on his back . . . while handcuffs were applied." *Id.* Armstrong "continued to kick at" one of the officers, "so the police shackled his legs too." *Id.*

---

may be an official public record, because this document is not central to Smith's Amended Complaint, the Court will not consider the Armstrong Involuntary Commitment Order when deciding the pending Motions to Dismiss. *See Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396–97 (4th Cir. 2006) (stating that the Court may consider "official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint [without converting a Rule 12(b)(6) motion into one for summary judgment] so long as the authenticity of these documents is not disputed").

"The officers then stood up to collect themselves," leaving "Armstrong facedown in the grass with his hands cuffed behind his back and his legs shackled." *Id.* Armstrong's sister "was the first to notice that her brother was unresponsive, so she asked the officers to check on him," which they did "immediately." *Id.* "When the officers flipped him over, [Armstrong's] skin had turned a blueish color and he did not appear to be breathing." *Id.* Although two officers administered CPR and Emergency Medical Service responders transported Armstrong to the hospital, "resuscitation attempts . . . were unsuccessful." *Id.* Armstrong "was pronounced dead shortly after admission" to the hospital. *Id.*

The Fourth Circuit concluded that the officers "are not entitled to summary judgment on the question whether they violated the Constitution" because "[v]iewing the record in the light most favorable to" Armstrong, the officers "used excessive force, in violation of the Fourth Amendment." *Id.* at 906. The Fourth Circuit also concluded that the officers were not entitled to qualified immunity because they violated Armstrong's clearly established constitutional right— namely "not to be subjected to tasing while offering stationary and non[]violent resistance to a lawful seizure." *Id.* at 907. The Fourth Circuit instructed that a taser

> may only be deployed when a police officer is confronted with an exigency that creates an immediate safety risk and that is reasonably likely to be cured by using the taser. The subject of a seizure does not create such a risk simply because he is doing something that can be characterized as resistance[]even when that resistance includes physically preventing an officer's manipulations of his body. Erratic behavior and mental illness do not necessarily create a safety risk either. To the contrary, when a seizure is intended solely to prevent a mentally ill individual from harming himself, the officer effecting the seizure has a lessened interest in deploying potentially harmful force.

*Id.* at 909–10.

### b.      Legal Standard:  § 1983 Excessive Force Claims
###         Under the Fourth Amendment

As explained in *Armstrong*, "[a] claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other seizure of a person is properly analyzed under the Fourth Amendment's objective reasonableness standard." *Armstrong*, 810 F.3d at 899 (internal quotation marks and citations omitted).  "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application."  *Id.* (citations omitted).  Rather, it "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id.* (citations omitted).

In making this determination, a reviewing court should balance three factors:  (1) "the severity of the crime at issue;"[19] (2) "the extent to which the suspect poses an immediate threat to the safety of the officers or others;" and, (3) "whether the suspect is actively resisting arrest or attempting to evade arrest by flight."  *Id.* (citations omitted).  "To properly consider the reasonableness of the force employed" a reviewing court must "view it in full context with an eye toward the proportionality of the force in light of all the circumstances."  *Id.* (internal quotation marks and citations omitted).

### 2.      Smith's Excessive Force Claim Against Officer Watters

The Court begins its analysis of Smith's § 1983 excessive force claim with the analysis as to Officer Watters, who tased Jones.  The Court concludes that Smith has alleged plausible facts

---

[19] The Fourth Circuit recognized that the first factor "is intended as a proxy for determining whether 'an officer [had] any reason to believe that [the subject of a seizure] was a potentially dangerous individual.'"  *Armstrong*, 810 F.3d at 900 (quoting *Smith v. Ray*, 781 F.3d 95, 102 (4th Cir. 2015)).

that, under the Fourth Circuit's guidance in *Armstrong*, Smith's claim survives at this early stage of the litigation.

### a. Although Jones Did Not Commit a Crime, Officer Watters Had Reason to Believe Jones Could Be a Dangerous Individual

When applying the first factor to a mentally ill individual, the Fourth Circuit has recognized that "[t]he problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense." *Id.* at 900 (citations omitted). Similarly, "[t]he use of force that may be justified by the government's interest in seizing a mentally ill person, therefore, differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community." *Id.* (internal quotation marks and citations omitted). The Fourth Circuit cautioned that "[m]ental illness, of course, describes a broad spectrum of conditions and does not dictate the same police response in all situations." *Id.* (citations omitted).

In *Armstrong*, the Fourth Circuit suggested that counseling a mentally ill individual "is ordinarily advisable, where feasible, and may provide the best means of ending a crisis." *Id.* (citation omitted). "[E]ven when this ideal course is not feasible, officers who encounter an unarmed and minimally threatening individual who is exhibiting conspicuous signs that he is mentally unstable must de[]escalate the situation and adjust the application of force downward." *Id.* (internal alterations, quotation marks, and citations omitted).

Here, similar to *Armstrong*, Jones had not committed a crime when the officers, including Officer Watters, arrived to take him into custody. The Fourth Circuit recognized that in this situation, the first excessive force factor "weighs heavily in [the subject's] favor." *Id.* at 899.

However, the Fourth Circuit has also recognized that the first excessive force factor "is intended as a proxy for determining whether an officer had any reason to believe that the subject of a seizure was a potentially dangerous individual." *Id.* at 900 (internal alterations, quotation marks, and citations omitted). Here, similar to *Armstrong*, the officers arrived on the scene to arrest Jones pursuant to an Emergency Custody Order, issued by a Virginia magistrate after his aunt submitted a written affidavit.[20] Unlike the involuntary commitment order in *Armstrong*, however, the Emergency Custody Order identified Jones as both a danger to himself and to others. But the Emergency Custody Order did not include a separate box to allow the magistrate to indicate that Jones constituted a threat only to himself or only to others. Rather, the Emergency Custody Order, included only a single option[21]—that identified Jones as both a threat to himself and to others.

However, Jones's aunt's affidavit to the Emergency Custody Order suggested that Jones may have been dangerous to others at the time she requested the Emergency Custody Order. In her affidavit, Jones's aunt stated that she requested the Emergency Custody Order because Jones

---

[20] Smith did not attach the Emergency Custody Order and the adjoining affidavit to the Amended Complaint. However, the Defendants submitted it as an attachment to each of the Motions to Dismiss. (ECF No. 26-1, 28-1, 30-1, 32-1.) Because this document is central to Smith's claims and Smith does not dispute the authenticity of the Emergency Custody Order submitted by Defendants, the Court will consider both the Emergency Custody Order and the affidavit in deciding the instant motions. *See Witthohn*, 164 F. App'x at 396–97.

[21] The Emergency Custody Order stated that Jones

pursuant to § 37.2-808, is incapable of volunteering or unwilling to volunteer for treatment, has a mental illness and is in need of hospitalization or treatment, and there exists a substantial likelihood that, as a result of mental illness, the respondent will, in the near future, cause serious physical harm to self or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information OR suffer serious harm due to respondent's lack of capacity to protect self from harm or to provide for respondent's own basic human needs.

(Emergency Custody Order 1, ECF No. 26-1.)

was not taking his medication and had been "hallucinat[ing], talking about killing, talking suicide, leaving stove on in home to burn house down." (Emergency Custody Order 2.) She expressed concern that "[i]f something [is] not done I'm very sure that it will be a [tragedy] in this town." (*Id.*) She also stated that she "believe[d] that [Jones] is also back smoking crack[]cocaine that is a danger to everyone." (*Id.*)

Based on the Emergency Custody Order, at the time he attempted to take him into custody, Officer Watters could have reasonably known that Jones suffered from a mental illness. Similarly, he also likely knew that Jones's aunt was concerned about Jones's behavior and drug usage, which she noted was "a danger to everyone." (*Id.* 2.) When officers, including Officer Watters, arrived at the EZ Convenient Shop, Jones started his car. Although the officers blocked Jones's car with their police cars, Jones refused to get out of the car when instructed to. Based on the information in the Complaint, when Officer Watters saw Jones in the EZ Convenient Shop parking lot, had did not know whether or not Jones was armed.

Therefore, under the first excessive force factor, even accepting as true all of Smith's well pleaded factual allegations, Officer Watters possessed at least some information indicating that Jones could have been a dangerous individual. *See Armstrong*, 810 F.3d at 900 (recognizing that the first excessive force factor "is intended as a proxy for determining whether an officer had any reason to believe that the subject of a seizure was a potentially dangerous individual" (internal quotation marks and alterations omitted)). However, Jones had not committed a crime. *See id.* at 899 (recognizing that where the individual has not committed a crime, the first excessive force factor "weighs heavily in [the subject's] favor"). Therefore, the first excessive force factor applies neutrally.

## b.     Jones Posed an Immediate Threat to the Safety of Others

The second excessive force factor—"the extent to which the suspect poses an immediate threat to the safety of the officers or others"—weighs slightly in Officer Watters's favor. *Id.* at 899 (internal quotation marks omitted).

Unlike the involuntary commitment order in *Armstrong*, the Emergency Custody Order identified Jones as a threat to himself and to others. (Emergency Custody Order 1.) Although the Emergency Custody did not have a separate space to identify Jones as only a danger to himself, Jones's aunt's affidavit shows that Jones was a threat to himself and to others. (*See* Emergency Custody Order 2.) Jones's aunt specifically stated that she thought "[i]f something [is] not done I'm very sure that it will be a [tragedy] in this town." (*Id.*) She also stated that Jones was not taking his medication and had been "hallucinat[ing], talking about killing, talking suicide, leaving stove on in home to burn house down." (*Id.*)

Similarly, when the officers approached Jones at the EZ Convenient Shop, he started his car. (Am. Compl. ¶ 86.) Jones also refused to get out of the car when instructed to. (*Id.* ¶ 88.) Although Smith asserts that Jones "was unarmed and contained within his vehicle and posed no danger to the officers who outnumbered him," (*id.* ¶ 90), the Emergency Custody Order contradicts this. Rather, it appears that the officers could reasonably have considered Jones— when his engine was running, he was in the driver's seat, and he refused to exit the vehicle—to be a threat both to their safety and to the safety of others. Once Jones moved to the passenger side, the danger from his using the car as a weapon, (*see* Mem. Supp. Sheriff Defs. Mot. Dismiss 13, ECF No. 26), ceased. Therefore, the second excessive force factor weighs only slightly in Officer Watters's favor.

### c.      <u>Jones Actively Resisted Arrest</u>

The third excessive force factor—"whether the suspect is actively resisting arrest or attempting to evade arrest by flight"—slightly favors Officer Watters. *Armstrong*, 810 F.3d at 899 (internal quotation marks and alterations omitted).

Similar to Armstrong, Jones resisted arrest. The Fourth Circuit recognized that in this situation, some force is justified. *See Armstrong*, 810 F.3d at 901 ("Noncompliance with lawful orders justifies some use of force, but the level of justified force varies based on the risks posed by the resistance"). Unlike Armstrong, Jones was in a position to harm the officers when he resisted arrest. At the time he resisted arrest, Armstrong clung to the post that supported a stop sign. *See id.* at 896–97. Jones, on the other hand, sat inside a running vehicle, suggesting danger at least until he moved to the passenger seat. As stated above, Jones's aunt's affidavit in support of the Emergency Custody Order runs counter to Smith's contention that Smith posed no danger when he was located in the vehicle. Jones's aunt considered Jones a threat to others and Jones turned on his vehicle as the officers approached his car. Because Jones resisted arrest and was in a position to hurt officers as he sat in the driver's seat of his running vehicle, the use of some force in taking Jones into custody was reasonable in light of *Armstrong*. *See id.* at 901–02.

### d.      **At This Early Stage, Officer Watters Use of Force—Tasing Jones—Was Not Proportional**

Here, the first excessive force factor is neutral, but the other two factors weigh slightly in favor of Officer Watters. Therefore, the Court must determine whether the use of force was "proportional[] . . . in light of all the circumstances." *Id.* at 899.

The Fourth Circuit has addressed the reasonableness of tasing an individual in several cases. For instance, in *Armstrong*, the Fourth Circuit recognized that "tasers are proportional force *only* when deployed in response to a situation in which a reasonable officer would perceive

25

some immediate danger that could be mitigated by using the taser." *Id.* at 903. Recognizing the power of a taser, the *Armstrong* court stated that "[d]eploying a taser is a serious use of force. The weapon is designed to 'caus[e] . . . excruciating pain,' and application can burn a subject's flesh." *Id.* at 902 (citations omitted). A "taser inflicts a painful and frightening blow." *Id.* (internal quotation marks and citations omitted).

In *Meyers*, the Fourth Circuit focused on whether the arrestee posed an immediate danger when considering whether the use of a taser constituted a proportional response. *See Meyers v. Baltimore Cty.*, 713 F.3d 723 (4th Cir. 2013). In that case the court concluded that when the arrestee held a baseball bat and resisted arrest, the use of a taser was justified. *Id.* at 733. However, once the arrestee dropped the bat, the officers continued use of the taser was not proportional. *Id.* at 734.

Similarly, in *Orem*, which the Fourth Circuit decided utilizing the Fourteenth Amendment standard rather than the Fourth Amendment standard, the court concluded that the use of a taser was not proportional where the arrestee was handcuffed, locked in the back seat of a police car, and her ankles were locked in a hobbling device. *Orem v. Rephann*, 523 F.3d 442, 447–49 (4th Cir. 2008).[22]

Here, unidentified officers broke the driver's side window of Jones's vehicle. Jones "then moved to the passenger side of the vehicle." (Am. Compl. ¶ 93.) "A second officer then broke the passenger side window and opened the door and removed [Jones] from the vehicle." (*Id.* ¶ 94.) "The officers attempted to get [Jones] on the ground and they tased him multiple

---

[22] In *Orem*, the Fourth Circuit stated that the Fourth Amendment's "objective reasonableness standard" did not apply to arrestees or pretrial detainees. *Orem*, 523 F.3d at 445–46. The *Orem* therefore applied the Fourteenth Amendment standard. *Id.* at 446. The Supreme Court has since extended the Fourth Amendment's protections to pretrial detainees. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).

times." (*Id.* ¶ 97.) "Officer Wat[t]ers deployed his taser and struck Jones in the chest." (*Id.* ¶ 98.) Smith asserts that "[t]he officers continued to tase [Jones] as he was pinned to the pavement." (*Id.* ¶ 101.)

At this early stage, the Court cannot conclude that Officer Watters use of the taser was proportional. Jones may have posed an immediate threat to the officers when he was located in the driver's seat of his running vehicle. However, once he had been removed, he was surrounded by officers and posed little continued danger. Yet, Smith contends that the officers continued to tase Jones. At this early stage, the Court must presume the truth of this factual allegation.

"[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Meyers*, 713 F.3d at 733 (quoting *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005)). Once the officers removed Jones from the vehicle, the threat of harm was reduced even more than when he sat in the passenger seat. Although the officers knew that Jones suffered from mental illness, no allegations suggest that the officers attempted to calm Jones down, to counsel him, or otherwise mitigate the forced used in his arrest. *See Armstrong*, 810 F.3d at 900 (stating that "officers who encounter an unarmed and minimally threatening individual who is 'exhibit[ing] conspicuous signs that he [i]s mentally unstable' must 'de[]escalate the situation and adjust the application of force downward.'" (citations omitted)). In contrast, it appears that Officers Watters used his taser without any attempt to deescalate the situation. *See id.* Although the arresting officers could have used some force to take Jones into custody, "[p]ainful, injurious, serious inflictions of force, like the use of a taser, do not become reasonable simply because officers have authorization to arrest a subject who is unrestrained." *Id.* at 904. Presuming the truth of Smith's well pleaded factual allegations and making all reasonable inferences in favor of Smith, the Court concludes that Officer Watters

use of the taser was not a proportional use of force once Jones had been removed from the vehicle.[23]  Therefore, Smith has sufficiently alleged that Officer Watters violated Jones's Fourth Amendment rights when Officer Watters used excessive force against Jones.[24]

### e.    Qualified immunity Does Not Protect Officer Watters From Liability on Smith's § 1983 Excessive Force Claim

Officer Watters argues that even if Smith plausibly alleges a § 1983 excessive force claim against him, qualified immunity protects him from liability.  However, for purposes of this Motion to Dismiss, the Court cannot conclude that qualified immunity protects Officer Watters from liability.

Qualified immunity shields government officials from civil liability when they perform discretionary functions "insofar as their conduct does not violate clearly established . . . rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  The qualified immunity defense ensures that

---

[23] Although Smith's allegations that "[t]he officers continued to tase [Jones] as he was pinned to the pavement," (Am. Compl. ¶ 101), and that "[w]hile [Jones] was laying on the ground, a police officer retrieved a rag from his vehicle and placed it in his mouth," (*id.* ¶ 102), cannot be used against Officer Watters, these allegations also suggest the use of force that was not proportional to the situation.  *See Armstrong*, 810 F.3d at 900.  If, through discovery, Smith identifies the officers who engaged in this conduct, she may seek to amend her Complaint to name such officer as a defendant in this action.

[24] To state a claim under § 1983, in addition to alleging that Officer Watters violated Jones's constitutional rights, Smith must also allege that Officer Watters took these actions under the color of state law and that Officer Watters's actions proximately caused Smith's damages. *See Daniczek*, 156 F. Supp. 3d at 747.
    Here, Smith alleges that Officer Watters took these actions in his capacity as a police officer.  She also claims that Officer Watters use of the taser resulted in Jones's death.  In support of this contention, Smith cites part of the corner's report, which lists Jones's cause of death as "[c]omplications of anoxic brain injury due to excited delirium syndrome associated with schizophrenia, physical exertion and conducted electrical weapon use."  (Am. Compl. ¶ 111.)  Therefore, as to the §1983 excessive force claim against Officer Watters, Smith sufficiently states a claim.

"[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

To overcome qualified immunity a plaintiff must meet a two step inquiry:[25]

> First, a court must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.[26]

*Pearson*, 555 U.S. at 232 (internal citations omitted).

As described above, Smith has sufficiently alleged that Officer Watters violated Jones's Fourth Amendment rights when Officer Watters used excessive force in taking Jones into custody. The Court must now determine whether this constitutional right was "clearly established" at the time Officer Watters attempted to take Jones into custody. *Id.*

The Fourth Circuit has addressed a police officer's use of a taser on several occasions in recent years. *See, e.g.*, *Brooks*, 924 F.3d 104 (decided in 2019); *Armstrong*, 810 F.3d 892 (decided in 2016); *Meyers*, 713 F.3d 723 (decided in 2013). Officer Watters tased Jones on January 20, 2017. Although this event predates the Fourth Circuit's decision in *Brooks*, it is nearly one year after the Fourth Circuit decided *Armstrong*. In *Armstrong*, the Fourth Circuit concluded that "Armstrong's right not to be subjected to tasing while offering stationary and

---

[25] The Supreme Court has instructed that courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[26] In assessing whether the rights allegedly violated were clearly established at the time of the officer's conduct, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "The inquiry is an objective one, dependent not on the subjective beliefs of the particular officer at the scene, but instead on what a hypothetical, reasonable officer would have thought in those circumstances." *Wilson v. Kittoe*, 337 F.3d 392, 402 (4th Cir. 2003) (citing *Milstead v. Kibler*, 243 F.35 157, 161 (4th Cir. 2001)).

non[]violent resistance to a lawful seizure" was clearly established. *Armstrong*, 810 F.3d at 907. In *Meyers*, decided approximately four years before Jones's tasing, the Fourth Circuit concluded that "officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity." *Meyers*, 713 F.3d at 734 (quoting *Bailey v. Kennedy*, 349 F.3d 731, 74–45 (4th Cir. 2003)).

An officer may violate a clearly established constitutional right, even if a court has not previously established that right to be clearly established. *Id.* (stating that the Fourth Circuit has "repeatedly . . . held that it is not required that a right violated already have been recognized by a court in a specific context before such right may be held 'clearly established' for purposes of qualified immunity." (citations omitted)). Although neither the Parties nor the Court has found a case that is on all fours to the case at issue, in light of relevant Fourth Circuit precedent, it was not reasonable for Officer Watters to tase Jones once Jones had been removed from the vehicle and officers surrounded him. Assuming the truth of Smith's well pleaded factual allegations, it certainly was not reasonable for officers to continue to tase Jones once he was pinned to the ground. *See Meyers*, 713 F.3d, at 735 (concluding that an officer was not entitled to qualified immunity where the officer continued to tase the arrestee after the arrestee had dropped the baseball bat and was effectively secured on the ground). Jones—as an unarmed mentally ill individual who had been removed from the passenger side of his running vehicle and was surrounded by officers—had a clearly established right to be free from excessive force at the time Officer Watters tased him. *See Armstrong*, 810 F.3d at 907; *Meyers*, 713 F.3d at 734. Smith plausibly alleges the Defendants violated this clearly established right by tasing Jones when attempting to take him into custody.

Because Smith plausibly alleges that Officer Watters violated Jones's Fourth Amendment rights and Jones's rights were clearly established at the time, Officer Watters is not entitled to qualified immunity here. Smith's § 1983 excessive force claim may proceed against Officer Watters. The Court now turns to Smith's § 1983 excessive force claim against Chief of Police Stuart Bowen, as Officer Watters's supervisor, and the Town of South Hill, as the municipality that employed Officer Watters.

### 3. The Court Will Dismiss Smith's Excessive Force Claim Against Stuart Bowen as Officer Watters's Supervisor

Smith states that "Chief of Police, Stuart Bowen had responsibility over the policies, procedures, practices, and training of the police officers under the employ of the South Hill Police Department." (Am. Compl. ¶ 54.) She claims that Bowen also "was responsible for the day to day operation of the South Hill Police Department, including the hiring, supervising, retaining, disciplining, and terminating police officers under the employ of the South Hill Police Department." (*Id.* ¶ 55.) As Officer Watters's supervisor, Bowen could be liable to Smith under a theory of supervisory liability, but Smith fails to state a supervisory liability claim here.

### a. Legal Standard: Supervisory Liability

The "doctrine of *respondeat superior* has no applicability to § 1983 claims." *Harbeck v. Smith*, 814 F. Supp. 2d 608, 626 (E.D. Va. 2011) (citing *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004)). "Given that limitation, supervisors can be held liable 'in their individual capacities only for their personal wrongdoing[27] or supervisory actions that violated

---

[27] Although Smith does not specifically say that she brings her claims against Bowen in his capacity as a supervisor at the South Hill Police Department, she makes no allegation that Bowen was at the scene when Officer Watters tased Jones. Therefore, Smith fails to state a § 1983 claim against Bowen for his personal wrongdoing and she must proceed against Bowen under a theory of supervisory liability.

constitutional norms.'" *Id.* at 626–27 (quoting *Clark v. Md. Dep't of Pub. Safety & Corr. Servs.*, 316 F. App'x 279, 282 (4th Cir. 2009)).

In order to establish supervisory liability under § 1983, a plaintiff must demonstrate:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices []; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff

*Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

The first element, which involves actual or constructive knowledge, can be satisfied by showing: "(1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury." *Shaw*, 13 F.3d at 799. "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Id.* (citations omitted).

The second element requires the plaintiff to show "deliberate indifference to or tacit authorization of the alleged offensive practices." *Baynard*, 268 F.3d at 235. A plaintiff may establish deliberate indifference by "demonstrating a supervisor's 'continued inaction in the face of documented widespread abuses.'" *Shaw*, 13 F.3d at 799 (citations omitted). Establishing deliberate indifference involves carrying "a heavy burden of proof" because deliberate indifference cannot be established by "pointing to a single incident or isolated incidents." *Id.* To hold a supervisor liable under a tacit authorization theory requires pleading facts supporting the

32

inference that the "supervisor fail[ed] to take action in response to a known pattern of comparable conduct occurring before the incident at issue took place." *Danser v. Stansberry*, 772 F.3d 340, 350 (4th Cir. 2014) (citation omitted). Furthermore, the standard for establishing deliberate indifference recognizes that a supervisor cannot "reasonably be expected to guard against the deliberate criminal acts of . . . properly trained employees [with] no basis upon which to anticipate the misconduct." *Shaw*, 13 F.3d at 799 (citation omitted).

Finally, the third element requires a showing of causation. A plaintiff can show causation by demonstrating "an 'affirmative causal link' between the supervisor's inaction and the harm suffered by the plaintiff." *Id.* (citation omitted). "This concept encompasses cause in fact and proximate cause . . . [and] may be supplied by [the] tort principle that holds a person liable for the natural consequences of his [or her] actions." *Id.* (quoting *Slakan*, 737 F.2d at 376).

### b. Analysis: Smith Fails to State a Claim Against Bowen Under a Theory of Supervisory Liability

Smith has failed to state a claim against Bowen under a theory of supervisory liability because her allegations pertain only to the tasing of Jones and do not include allegations of widespread or continuous abuse by Officer Watters.

The Court has concluded that Smith states a § 1983 claim against Officer Watters for his use of excessive force in tasing Jones. Therefore, Smith could bring a claim against Bowen in his capacity as Officer Watters's supervisor under a theory of supervisory liability. But, Smith's supervisory liability claim fails at the first element of § 1983 supervisory liability, which requires Smith to show "that [Bowen as] the supervisor had actual or constructive knowledge that his subordinate [here Officer Watters] was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff." *Baynard*, 268 F.3d at 235. Smith does not allege that Bowen had actual knowledge that Officer Watters would tase

Jones.  To rely on constructive knowledge, Smith must allege sufficient facts to show "conduct [that] is widespread, or at least has been used on several different occasions."  *Shaw*, 13 F.3d at 799.  Smith also fails to plausibly allege constructive knowledge because her allegations in the Amended Complaint pertain only to Officer Watters's tasing of Jones and do not include any other allegations of misconduct by Officer Watters.  Therefore, Smith does not even suggest "conduct [that] is widespread" or that occurred on several different occasions.  *Id.*  A single allegation of misconduct by a subordinate is not enough to hold a supervisor liable on a § 1983 claim under a theory of supervisory liability.  *See id.*

The Court will grant the South Hill Defendants Motion to Dismiss as to Smith's § 1983 excessive force claim against Bowen, as Officer Watters's supervisor.

### 4. The Court Will Dismiss Smith's Excessive Force Claim Against the Town of South Hill as Officer Watters's Employer

The Court has previously dismissed Smith's claims against the South Hill Police Department because it cannot be sued separately from the Town of South Hill.  The Court now turns to Smith's claims against the Town of South Hill as Officer Watters's employer, which the Court examines under a theory of municipality liability.

Smith states that she brings her claims against the Town of South Hill both "for their civil rights violations, their own tortious acts and/or omissions and under the theory of respondeat superior."  (Am. Compl. ¶ 65.)  Smith also alleges that "[a]t all times relevant . . . Defendants were acting under the direction and control, and pursuant to the official rules, regulations, policies and procedures of Defendants the Town of South Hill . . . "  (Am. Compl. ¶ 170.)

The Court will dismiss Smith's claims against the Town of South Hill both under a theory of respondeat superior and § 1983 municipality liability.

## a.     Legal Standard:  Municipality Liability

"For purposes of Section 1983, a municipality is considered a 'person' and thus is subject

to suit."  *Hunter v. Town of Mocksville, N.C.*, 897 F.3d 538, 553 (4th Cir. 2018) (citing *Monell v.*

*Dep't of Social Servs.*, 436 U.S. 658, 690 (1978)).  A municipality cannot, however, "be held

liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held

liable under § 1983 on a *respondeat superior* theory."  *Id.* at 553–54 (quoting *Monell*, 436 U.S.

at 691).  Liability will arise "when execution of a government's policy or custom, whether made

by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy,

inflicts the injury that the government as an entity is responsible [for] under § 1983."  *Id.* at 554

(quoting *Monell*, 436 U.S. at 694).  "[I]t is plain that municipal liability may be imposed for a

single decision by municipal policymakers under appropriate circumstances."  *Id.* (quoting

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)).

The Fourth Circuit has identified four avenues through which a § 1983 plaintiff may hold

a municipality liable for a policy or custom:

> (1) through an express policy, such as a written ordinance or regulation; (2) through
> the decisions of a person with final policymaking authority; (3) through an
> omission, such as a failure to properly train officers, that "manifest[s] deliberate
> indifference to the rights of citizens;" or (4) through a practice that is so "persistent
> and widespread" as to constitute a "custom or usage with the force of law." [28]

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 217

(4th Cir. 1999)).

As to the third basis for municipality liability, which encompasses a failure to properly

train officers, liability may only be imposed when "the failure to train amounts to deliberate

---

[28] In her Response to the South Hill Defendants Motion to Dismiss, Smith argues only
that the Town of South Hill's failure to train its officers resulted in deliberate indifference so as
to give rise to municipality liability.  (*See* Resp. South Hill Defs. Mot. Dismiss 14–18.)
Therefore, the Court will analyze only the third type of municipality liability claim.

indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Importantly, this requires a "'deliberate' or 'conscious' choice by a municipality." *Id.* at 389.

A plaintiff cannot properly support a failure to train claim "by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible." *Id.*

> In resolving the issue of a city's liability, the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.

*Id.* at 390–91 (citations omitted). "Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury[]causing conduct." *Id.* at 391. Finally, the deficiency in a training program "must be closely related to the ultimate injury." *Id.*

### b. Analysis: Smith Fails to State a Claim Against the Town of South Hill Under a Theory of Municipality Liability

Here, Smith alleges that the Town of South Hill is liable both under a theory of *respondeat superior* and for its own actions when it failed to train officers regarding the applicable standards for the use of their tasers against mentally ill individuals following the Fourth Circuit's *Armstrong* decision. The Court will dismiss Smith's municipality liability claim under both theories of liability.

### i. Smith's Claim Against the Town of South Hill Based on a Theory of *Respondeat Superior*

At the outset, the Court must dismiss Smith's claim against the Town of South Hill that she brings under a theory of *respondeat superior*. Case law makes clear that "a municipality

cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Hunter*, 897 F.3d at 553–54 (quoting *Monell*, 436 U.S. at 691) (emphasis in original). Although the Town of South Hill employed Officer Watters at the time he tased Jones, Smith cannot hold the Town of South Hill liable for a § 1983 violation based solely on that relationship. Therefore, the Court will dismiss Smith's claim against the Town of South Hill, which she brought under a *respondeat superior* theory of liability.

### ii. Smith's Claim Against the Town of South Hill Based on a Theory of Municipality Liability Stemming From a Failure to Train Officers

The Court will also dismiss Smith's claim against the Town of South Hill that she basis on the Town of South Hill's alleged failure to train its police officers. To succeed on a failure to train claim, Smith must show that the officers received inadequate training. *See City of Canton*, 489 U.S. at 390. A showing that the Town of South Hill failed to properly train a single officer, such as Officer Watters, or that Jones's death could have been avoided if the responding officers had received additional training, will not suffice. *See id.* at 391.

Smith points to specific paragraphs of the Amended Complaint that she claims support her failure to train claim. For instance, she points to paragraphs 134 to 138 of the Amended Complaint to "describe[] the policies which give rise to *Monell* liability." (Resp. South Hill Defs. Mot. Dismiss 14.) Paragraphs 136 and 137, for instance, state in full:

> 136. Defendants, Mecklenburg County Sheriff R.W. "Bobby" Hawkins Jr. and South Hill Police Chief Stuart Bowen, the Town of South Hill and the Mecklenburg County Sheriff's Department knew or should have known that their police officers were inadequately and/or inappropriately trained in proper police procedures, relating to interactions with mentally ill citizens and the use of Taser weapons in light of the Fourth Circuit decision in *Armstrong*.

137.  Defendants, Mecklenburg County Sheriff R.W. "Bobby" Hawkins Jr. and South Hill Police Chief Stuart Bowen, the Town of South Hill and the Mecklenburg County Sheriff's Department routinely allow law enforcement officers to use TASER weapons without proper training, including training on the Fourth Circuit's holding in *Armstrong v. The Village of Pinehurst.*

(Am. Compl. ¶¶ 136–37.)

Similarly, she identifies specific paragraphs, paragraphs 171 to 175, to support her assertion that she "adequately states a 'plausible' claim  in her Amended Complaint for the Defendants' deliberate indifference' to the life, safety, bodily integrity, well[]being, liberty, and civil rights of Marcus Jones."  (Resp. South Hill Defs. Mot. Dismiss 15.)  For instance, she relies on paragraphs 171 and 173, which state:

171. Defendants the Town of South Hill, the South Hill Police Department, South Hill Police Chief Stuart Bowen, Mecklenburg County Sheriff R.W. "Bobby" Hawkins Jr. and the Mecklenburg County Sheriff's Department acted recklessly and with deliberate indifference to the safety of the public at large, including Plaintiff's decedent, Marcus Jones, by failing to properly train, supervise, control, direct, and monitor their police and law enforcement officers.

173. Though the Fourth Circuit dictates in *Armstrong v. The Village of Pinehurst* clearly [] established that violent force and taser use were prohibited in situations involving an unarmed, stationary, outnumbered and mentally ill man, the Town of South Hill, the South Hill Police Department, South Hill Police Chief Stuart Bowen, Mecklenburg County Sheriff R.W. "Bobby" Hawkins Jr. and the Mecklenburg County Sheriff's Department failed to properly train officers under their control and supervision to be familiar with the current status of the law.

(Am. Compl. ¶¶ 171, 173.)

These paragraphs, even taken together, fail to support Smith's municipality liability claim against the Town of South Hill because they do not plausibly plead the required elements of a failure to train claim.  For instance, beyond identifying the Fourth Circuit's *Armstrong* decision, Smith does not make any allegations regarding the "adequacy of the training program in relation to the tasks the particular officers must perform," which is the "focus" of a municipality liability claim under § 1983.  *City of Canton*, 489 U.S. at 390.  Rather, these paragraphs set forth only a

"formulaic recitation of the elements of a cause of action," *Moody v. City of Newport News*, 93

F. Supp. 3d 516, 531 (E.D. Va. 2015) (quoting *Iqbal*, 556 U.S. at 678), via "naked assertions of

wrongdoing" containing none of the required "factual enhancement . . . to cross the line between

possibility and plausibility of entitlement to relief," *Francis*, 588 F.3d at 193.  Therefore, the

Court will also dismiss Smith's § 1983 municipality liability claim against the Town of South

Hill in Count I.[29]

### 5.    Smith's Excessive Force Claim Against the Remaining Defendants

In the Amended Complaint, Smith brings her § 1983 claim against all Defendants.

Because her claim against the remaining Individual Defendants founders for the same reason, the

---

[29] In Count V of the Amended Complaint, Smith brings a claim for "Unconstitutional/Inadequate Policies, Training, and Procedures."  (Am. Compl. 25 (capitalization omitted).)  This is the only claim she brings against specific Defendants.  She names Mecklenburg County Sheriff R.W. "Bobby" Hawkins, Jr.; South Hill Police Chief Stuart Bowen, the South Hill Police Department; and the Mecklenburg County Sheriff's Department.  (*Id.*)  In support of this claim, Smith asserts that these Defendants "acted recklessly and with deliberate indifference to the safety of the public at large, including . . . Jones, by failing to properly train, supervise, control, direct, and monitor their police and law enforcement officers."  (*Id.* ¶ 171.)

Reading the Amended Complaint favorably, the Court interprets Count V as a claim for municipality liability under the Supreme Court's *Monell* decision.  *See Monell*, 436 U.S. at 690 (stating that "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.")  A *Monell* a claim is properly brought against a "[l]ocal governing body."  *Id.*  Therefore, the Court will analyze the claim only as to the Town of South Hill, and to the extent that it is applicable, the Mecklenburg County Sheriff's Department.

As explained above, Smith's municipality liability claim against the Town of South Hill fails because she has not pleaded plausible facts to support a failure to train *Monell* claim.  Her municipality liability claim against the Mecklenburg County Sheriff's Department fails for the same reason.  Therefore, the Court will dismiss Count V against the Town of South Hill and the County of Mecklenburg Sheriff's Department.

Court will discuss Smith's § 1983 excessive force claim against the remaining Individual Defendants collectively.[30]

In the Amended Complaint, Smith states that after Jones's aunt requested the Emergency Custody Order and Jones could not be found at his home, his aunt notified "the police" that Jones was located at the EZ Convenient Shop. (Am. Compl. ¶¶ 81, 83–84.) Smith asserts that approximately fifteen minutes later, "eight police officers from the South Hill Police Department and the Mecklenburg County Sheriff's Officer found [Jones] still in his parked car at the EZ Convenient Stop." (*Id.* ¶ 85.) She explains that after "[t]hey walked up to the car and [Jones] turn his car on to drive away," "[t]wo officers blocked his vehicle with their cruisers." (*Id.* ¶¶ 86–87.)

Smith avers that "an officer then broke the driver's side window" and Jones "moved to the passenger side of the vehicle." (*Id.* ¶¶ 92–93.) "A second officer then broke the passenger side window and opened the door and removed him from the vehicle." (*Id.* ¶ 94.) Smith states that "[t]he officers attempted to get [Jones] on the ground and they tased him multiple times." (*Id.* ¶ 97.) She specifies that "Officer Wat[t]ers deployed his taser and struck Jones in the chest." (*Id.* ¶ 98.) Smith asserts that "[t]he officers continued to tase [Jones] as he was pinned to the pavement." (*Id.* ¶ 101.) Smith concludes that Jones died as a result of the tasing and includes excerpts from the coroner's report in support of this assertion.

Even assuming the truth of the well pleaded factual allegations and making all reasonable inferences in favor of Smith, as the Court must at this procedural posture, these allegations do not suffice to raise a § 1983 excessive force claim against the remaining Individual Defendants.

---

[30] The remaining Individual Defendants include: Sheriff R.W. "Bobby" Hawkins, Jr.; Corporal Parrott; Investigator B.J. Mull; Lieutenant Zincone; Davis Cumbia; Major Terry Edmonds; Deputy Troy Walker; and, Deputy Bruce King.

*See Kensington*, 684 F.3d at 467.  Aside from Smith's assertion that Officer Watters and perhaps other officers tased Jones, Smith makes no allegation that any of the remaining Individual Defendants were present when Officer Watters tased Jones.  She also does not name the officer who put the rag in Jones's mouth.  (*See* Am. Compl. ¶ 102.)  To make such an assumption would not be a reasonable inference.  Based on these allegations, although it is *possible* that the remaining Individual Defendants could have been present at the scene, Smith has not pleaded factual allegations to show that it is *plausible*.[31]  *See Twombly*, 550 U.S. at 570 (requiring that a plaintiff plead sufficient factual allegations to "state a claim to relief that is plausible on its face").  Therefore, the Court will dismiss Smith's § 1983 excessive force claim against the remaining Individual Defendants.[32]

### D.  Smith's § 1983 Deprivation of Medical Care Claim

In Count I of the Amended Complaint, Smith states that Defendants deprived Jones of his civil rights by using excessive force, by depriving him of medical care, and by depriving him of life and physical liberty.  (Am. Compl. ¶ 143.)  Although the Court will allow Count I to proceed

---

[31] Smith states alleges that "Major Edwards called [Jones's aunt] three times and told her to meet her at the hospital."  (Am. Compl. ¶ 106.)  Smith does not name a "Major Edwards" as a defendant in this matter.  Although the Court will infer that Smith meant to say to Major *Edmonds* called Jones's aunt, this inference does not allow her § 1983 excessive force claim to survive against Major Edmonds.  Calling Jones's aunt to request that she meet the officers at the hospital does not give rise to any inference that Major Edmonds used any force against Jones.

[32] A single allegation of misconduct by a subordinate is not enough to hold a supervisor liable under § 1983 based on supervisory liability.  *See Shaw*, 13 F.3d at 799.  Here, Smith has not alleged any specific misconduct by a member of the Mecklenburg County Sheriff's Department.  The Court will, therefore, also dismiss Smith's § 1983 excessive force claim against Sheriff R.W. "Bobby" Hawkins, Jr. in his capacity as a supervisor over officers employed by the Mecklenburg County Sheriff's Department.
Similarly, Smith has failed to show any misconduct by a member of the Mecklenburg County Sheriff's Department.  This precludes her claims against the Mecklenburg County Sheriff's Department as the officers' employer.  *See Goines*, 822 F.3d at 173 (stating that "[t]he determination that [the officer] did not violate [the plaintiff's] constitutional rights also forecloses [the plaintiff's] claims against . . . [the officer's] employer." (citing cases)).

against Officer Watters based on his use of excessive force when tasing Jones, the Court will nonetheless dismiss Count I against all Defendants as to her deprivation of medical care claim.

### 1.    Legal Standard:  § 1983 Deprivation of Medical Care

Section 1983, by its own terms, prohibits constitutional violations by persons acting under the color of state law.  *See* 42 U.S.C. § 1983; *Brown v. Middleton*, 362 F. App'x 340, 343 (4th Cir. 2010) (unpublished) (per curiam).  A pretrial detainee who claims inadequate medical care properly alleges his or her claim under the Fourteenth Amendment.  *Douglass v. Sanok*, No. 3:05cv18, 2006 WL 2927780, at *10 (W.D. Va. Oct. 11, 2006); *see Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990) (stating that "[t]he Supreme Court has held that a pretrial detainee has a right to be free from any form of punishment under the Due Process Clause of the Fourteenth Amendment").  The Eighth Amendment standard, though, provides the standard by which the Court will evaluate Smith's deprivation of medical care claim because "rights of pre[]trial detainees under the Fourteenth Amendment . . . 'are at least as great as the Eighth Amendment protections available to a convicted prisoner.'"  *Id.* (quoting *Patten v. Nicols*, 274 F.3d 829, 834 (4th Cir. 2001)); *see also Belcher*, 898 F.2d at 34 (stating that "[t]he Fourteenth Amendment right of pretrial detainees, like the Eighth Amendment right of convicted prisoners, requires that government officials not be deliberately indifferent to any serious medical needs of the detainee").

To succeed on a § 1983 deprivation of medical care claim, Smith must plead sufficient facts to establish both a subjective component and an objective component under the applicable two part test.  *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (citation omitted).  As to the objective component, Smith must show that Jones suffered a "serious medical need[]."  *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  "[A] medical condition is serious when it

has 'been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Scinto v. Standsberry*, 841 F.3d 219, 225 (4th Cir. 2016)).

As to the subjective component, Smith must show "that the defendant . . . acted with 'deliberate indifference.'" *Id.* (quoting *Estelle*, 429 U.S. at 104). "The Supreme Court has explained that 'deliberate indifference entails something more than mere negligence,' but the standard 'is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Id.* at 357 (quoting *Farmer v. Brennen*, 511 U.S. 825, 835 (1994)). A defendant acts with deliberate indifference sufficient to establish a deprivation of medical care claim where the defendant has "actual knowledge of the [plaintiff's] serious medical needs and the related risks, but nevertheless disregarded them." *Id.* (citing *DePaolo v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018)). "A defendant's subjective knowledge can be proven 'through direct evidence of [his or her] actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence that [he or she] knew of a substantial risk from the very fact that the risk was obvious.'" *Id.* (quoting *Scinto*, 841 F.3d at 226)).

### 2. Analysis: Because Defendants Took Jones to the Hospital Immediately After Officer Watters Tased Him, Smith Fails to State a Deprivation of Medical Care Claim

Smith does not clearly state upon which conduct she relies to support her deprivation of medical care claim. The Court will infer that Smith relies on Defendants' actions following Officer Watters's tasing of Smith. Because Defendants immediately transported Jones to the hospital after Officer Watters tased him, Smith fails to allege a deprivation of medical care claim against all Defendants.

To properly allege a § 1983 deprivation of medical care claim, Smith must allege that Defendants "acted with 'deliberate indifference' (the subjective component) to [Jones's] 'serious medical needs' (the objective component)." *Gordon*, 937 F.3d at 356 (quoting *Estelle*, 429 U.S. 104). Here, Smith meets the objective component of the test because she states that prior to being tased Jones suffered from mental illness, which a doctor had diagnosed during Jones's prior admittance to the Virginia Beach Psychiatric Center. (*See* Emergency Custody Order 2; Am. Compl. ¶ 79.) *See Gordon*, 937 F.3d at 356 (stating that "a medical condition is serious when it has 'been diagnosed by a physician as mandating treatment.'" (quoting *Scinto*, 841 F.3d at 225)). Defendants knew or should have known about this diagnosis from the nature of the Emergency Custody Order. (*See* Emergency Custody Order 2; Am. Compl. ¶¶ 81–82.) Jones's health condition after Officer Watters tased him also meets the objective component of the test because it was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gordon*, 937 F.3d at 356. Specifically, Smith states that after Officer Watters tased Jones, Jones became non responsive. (Am. Compl. ¶ 104.) Similarly, Smith alleges that after the officers removed Jones from his car, they threw him to the ground, laid on top of him, and broke one of his ribs. (*Id.* ¶ 15.) Also, after Officer Watters tased Jones, an unnamed officer placed a rag in Jones's mouth. (*Id.* ¶ 102.) A lay person would have known that when someone becomes unresponsive following being tased and that person has a rag placed in his or her mouth, the person should be seen by a doctor. Therefore, Smith meets the objective component of her § 1983 deprivation of medical care claim.

Although Smith meets the first component, she fails to meet the second required component, the subjective component. The subjective component requires Smith to show that Defendants acted with deliberate indifference to Jones's serious medical condition. *See Gordon*,

937 F.3d at 356. Smith states that after Jones became non responsive "[t]he officers then put [Jones's] unresponsive body into the back of a police van and took him to the hospital." (Am. Compl. ¶ 105.) She alleges that an officer called Jones's aunt "three times and told her to meet her at the hospital." (*Id.* ¶ 106.) When Jones's aunt arrived at the hospital, someone advised her that Jones "had died on the way to the hospital." (*Id.* ¶ 107.) Jones was transferred to a different hospital where "[h]e was placed on a ventilator for [five] days and ultimately died." (*Id.* ¶¶ 108– 09.)

These allegations, although tragic, when read favorably to Smith, currently fail to establish deliberate indifference—the second required component of Smith's § 1983 deprivation of medical care claim. Here, Defendants took Jones to the hospital after he became unresponsive following Officer Watters's tasing. Smith has failed to show that Defendants acted with deliberate indifference, which is required to support her § 1983 deprivation of medical care claim. *See Douglass*, 2006 WL 2927780, at *10 (finding that no deliberate indifference existed where the officers took the plaintiff to the hospital "immediately after spraying Plaintiff's eyes with pepper spray"). Therefore, the Court will dismiss Smith's § 1983 deprivation of medical care claim against all Defendants.

### E.     Smith's § 1985 Conspiracy Claim

In Count I Smith cites 42 U.S.C. § 1985 in addition to 42 U.S.C. § 1983. Section 1983 allows an individual to recover for constitutional violations by a person acting under the color of state law while Section 1985 prohibits conspiracies to interfere with an individual's civil rights. *See* 42 U.S.C. §§ 1983, 1985. Although the Court will allow Smith's § 1983 excessive force claim to proceed against Officer Watters, the Court will dismiss Smith's § 1985 claim—applying a more stringent standard—against all Defendants.

1. **Legal Standard:  Section 1985 Claims**

Title 42, Section 1985 of the United States Code states, in relevant part:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

To state a claim for a § 1985 conspiracy, a plaintiff must show five elements:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class[]based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*A Soc'y Without a Name v. Va.*, 655 F.3d 342, 346 (4th Cir. 2011) (quoting *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995)).  "Moreover, the plaintiff 'must show an agreement or a meeting of the minds by [the] defendants to violate the [plaintiff's] constitutional rights."  *Id.* (quoting *Simmons*, 47 F.3d at 1377).  A plaintiff faces "a weighty burden to establish a civil rights conspiracy."  *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996).  Although the plaintiff "need not produce direct evidence of a meeting of the minds, [he or she] must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective."  *Id.* (citing cases).  The Fourth Circuit has "specifically rejected [§] 1985 claims whenever the purported conspiracy is alleged in a merely conclusory

manner, in the absence of concrete supporting facts." *A Soc'y Without a Name*, 655 F.3d at 346

(quoting *Simmons*, 47 F.3d at 1377).

> **2.    Analysis:  Because Smith Supports Her § 1985 Claim With Only Conclusory Allegations, Smith Fails to State a § 1985 Conspiracy Claim Against All Defendants**

Because Smith alleges only conclusory statements in support of her § 1985 conspiracy

claim and provides no supporting facts, Smith fails to state a § 1985 conspiracy claim against all

Defendants.

The Fourth Circuit has made clear that the standard for a § 1985(3) conspiracy claim

requires more than "conclusory allegations." *A Soc'y Without a Name*, 655 F.3d at 346.  Rather,

it requires "concrete facts." *Id.*  For instance, the Fourth Circuit has affirmed the lower court's

decision to dismiss a plaintiff's § 1985 conspiracy claim where the plaintiff failed "to allege with

any specificity the persons who agreed to the alleged conspiracy, the specific communications

amongst the conspirators, or the manner in which any such communications were made." *Id.* at

347.

Here, similar to the plaintiff in *A Society Without a Name*, Smith makes only conclusory

allegations in support of her conspiracy claim.  She seems to base her § 1985 claim on

Defendants' "refusal to stop the unconstitutional mistreatment of . . . Jones."  (Am. Compl.

¶ 128.)  For instance, she states that "[i]n violation of Section 1983 and 1985, Defendants'

concerted actions to escalate a confrontation with an outnumbered and mentally ill man

constitutes a meeting of the minds in which they agreed to violate . . . Jones'[s] constitutional

rights."  (*Id.* ¶ 129.)  She continues by asserting that "[t]heir mistreatment of . . . Jones evidenced

the fact that Defendants reached an understanding to violate . . . Jones'[s] rights."  (*Id.* ¶ 130.)  In

Count I, Smith avers that "Defendants had a meeting of the minds and escalated a static situation

involving a stationary, unarmed, outnumbered mentally ill man to one where officers violently mistreated him in violation of his constitutional rights." (*Id.* ¶ 146.) She maintains that "[t]he officers involved agreed to this unconstitutional mistreatment of . . . Jones when *Armstrong* . . . required them to come to his aid to prevent the gratuitous tasings." (*Id.* ¶ 148.)

As with many of Smith's allegations in the Amended Complaint, these allegations consist almost entirely of "formulaic recitation of the elements of a cause of action," *Moody*, 93 F. Supp. 3d at 531 (quoting *Iqbal*, 556 U.S. at 678), via "naked assertions of wrongdoing" containing none of the required "factual enhancement . . . to cross the line between possibility and plausibility of entitlement to relief," *Francis*, 588 F.3d at 193. Such allegations alone cannot suffice to state a § 1985 conspiracy claim, especially given the weighty burden to properly bring such a claim. *See A Soc'y Without a Name*, 655 F.3d at 347; *see also Twombly*, 550 U.S. at 555 (explaining that mere labels and conclusions do not suffice to state a claim). Therefore, the Court will dismiss Smith's § 1985 conspiracy claim against all Defendants.

**F.** **Smith's False Arrest Claim**

In Count VI of the Amended Complaint, Smith brings a claim entitled "False Arrest." (Am. Compl. 27 (capitalization omitted).) Smith charges false arrest against all Defendants, and maintains that "Defendants South Hill Police Officers and Mecklenburg County Sheriff's Department Officers seized [Jones] without a warrant and without probable cause." (*Id.* ¶ 183.) Smith states that Jones's arrest "constitutes an unreasonable seizure prohibited by the Fourth Amendment." (*Id.* ¶ 184.) Because the officers arrested Jones pursuant to an Emergency Custody Order, signed by a Virginia magistrate and requested by Jones's aunt, Smith fails to state a false arrest claim.

## 1.    Legal Standard:  False Arrest Claims

"Nearly identical principles govern claims for false arrest under the Fourth Amendment and for false imprisonment under Virginia law."[33]  *King v. Darden*, No. 3:17cv742, 2019 WL 1756531, at *5 (E.D. Va. Apr. 19, 2019).  "An arrest pursuant to a facially valid warrant, even when probable cause does not support the warrant, precludes both claims."  *Id.* (citing *Porterfield v. Lott*, 156 F.3d 563, 568 (4th Cir. 1998); *Montanile v. Botticelli*, No. 1:08cv716, 2008 WL 5101775, at *5 (E.D. Va. Nov. 25, 2008)).  "In other words, 'a public official cannot be charged with false arrest when he [or she] arrests a defendant pursuant to a facially valid warrant."  *Id.* (quoting *Dorn v. Town of Prosperity*, 375 F. App'x 284, 285–86 (4th Cir. 2010)); *see also Lewis v. Kei*, 708 S.E.2d 884, 890 (Va. 2011) (stating that under Virginia law "[i]f the plaintiff's arrest was lawful, the plaintiff cannot prevail on a claim of false imprisonment." (citing *DeChene v. Smallwood*, 311 S.E.2d 749, 752 (Va. 1984))).

## 2.    Analysis:  Because the Officers Sought to Arrest Jones Pursuant to an Emergency Custody Order Issued by a Virginia Magistrate, Smith Fails to State a False Arrest Claim

Here, Smith states that Jones's aunt requested and received an Emergency Custody Order for Jones's arrest after she determined that he was not taking his medication.  (Am. Compl. ¶ 81.)  Although Smith does not attach the Emergency Custody Order to the Amended Complaint, the Court has previously concluded that it may consider as a document integral to Smith's Amended Complaint.  Because the Emergency Custody Order allowed the officers to arrest Jones, Smith fails to state a claim for false arrest under either § 1983 or Virginia law.

---

[33] Smith does not clearly state the legal basis for her false arrest claim.  Although she points to the Fourth Amendment, she does not cite 42 U.S.C. § 1983, which allows an individual to recover for violations of his or her constitutional rights.  Because Smith's claim would fail under either the Fourth Amendment or Virginia law—as the same legal standard governs both types of claims—the Court would dismiss Count VI under either legal standard.

Case law makes clear that when law enforcement officers arrest a person pursuant to a facially valid warrant, the arrestee cannot maintain a cause of action for false arrest. *See Lewis*, 708 S.E.2d at 890; *King*, 2019 WL 1756531, at *5. Similarly, when officers comply with the Virginia statute[34] that creates emergency custody orders, even if such an order has not been issued by a Virginia magistrate, the arrest is "*per se* reasonable for the purposes of the Fourth Amendment." *Douglass*, 2006 WL 2927780, at *7. Accordingly, when an officer detains a person pursuant to a facially valid emergency custody order, a person cannot maintain a cause of action for false arrest under § 1983 or false imprisonment under Virginia law. *See Burruss v. Riley*, 192 F. Supp. 3d 655, 665 (W.D. Va. 2016) (assuming that similar principles apply to

---

[34] Relevant to the *Douglass* court's analysis, Virginia Code § 37.2-808, provides that:

> A law[]enforcement officer who, based upon his observation or the reliable reports of others, has probable cause to believe that a person meets the criteria for emergency custody as stated in this section may take that person into custody and transport that person to an appropriate location to assess the need for hospitalization or treatment without prior authorization.

Va. Code § 37.2-808(D).

This same statute articulates the standard by which a Virginia magistrate may issue an emergency custody order, stating:

> Any magistrate shall issue, upon the sworn petition of any responsible person, treating physician, or upon his own motion, an emergency custody order when he [or she] has probable cause to believe that any person (i) has a mental illness and that there exists a substantial likelihood that, as a result of mental illness, the person will, in the near future, (a) cause serious physical harm to himself or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, if any, or (b) suffer serious harm due to his lack of capacity to protect himself from harm or to provide for his basic human needs, (ii) is in need of hospitalization or treatment, and (iii) is unwilling to volunteer or incapable of volunteering for hospitalization or treatment.

Va. Code § 37.2-808(A). It also defines what information the magistrate may consider to establish probable cause and requires "[t]he magistrate issuing an emergency custody order [to] specify the primary law[]enforcement agency and jurisdiction to execute the emergency custody order and provide transportation." *See* Va. Code §§ 37.2-808(A), (C).

emergency custody orders and finding that it was "reasonable for [police officers] to rely on [the emergency custody order] to establish probable cause to detain [the plaintiff]").

Smith does not dispute the validity of the Emergency Custody Order. Importantly, the officers in this case did not obtain the Emergency Custody Order themselves. Rather, Jones's aunt sought and received the Emergency Custody Order after expressing her concerns to the Virginia magistrate regarding Jones's mental health. Because the officers could reasonably rely on the Emergency Custody Order, which a Virginia magistrate issued and which Jones's aunt—a third party—requested, Smith cannot maintain her false arrest claim under either § 1983 or Virginia state law.[35]  *See Burruss*, 192 F. Supp. 3d at 665; *Douglass*, 2006 WL 2927780, at *7; *King*, 2019 WL 1756531, at *5. Therefore, the Court will dismiss Smith's false arrest claim in Count VI against all Defendants.

### G.  Smith's Wrongful Death and Survival Action Claims

Smith entitles Count II as "Survival Action" and brings that claim against all Defendants. (Am. Compl. 22 (capitalization omitted).)  In support of this claim Smith states that "[p]ursuant to Virginia Code § 8.01-25, Plaintiff's decedent Marcus Jones'[s] right of action and the claims

---

[35] For a similar reason, Smith's § 1983 deprivation of life and physical liberty claim in Count I also fails. "[T]he general right to be free from seizure unless probable cause exists is clearly established in the mental health seizure context." *Goines*, 822 F.3d at 163 (quoting *Bailey v. Kennedy*, 349 F.3d 731, 741 (4th Cir. 2003)). "[P]robable cause to seize a person for a psychological evaluation [exists] when the facts and circumstances within [the defendant's] knowledge and of which [the defendant] had reasonably trustworthy information were sufficient to warrant a prudent man to believe that the person poses a danger to himself [or herself] or others." *Id.* at 172 (quoting *Cloaninger ex rel. Estate of Cloaninger v. McDevitt,* 555 F.3d 324, 334 (4th Cir.2009)).

Similar to her false arrest claim, the Emergency Custody Order defeats Smith's § 1983 deprivation of life and physical liberty claim in Count I. Because the officers reasonably relied on the Emergency Custody Order (which a Virginia magistrate issued and Jones's aunt requested) Smith fails to state a § 1983 deprivation of life and physical liberty claim against all Defendants.

against the Defendants named herein survive in favor of Violet Smith, the legal representative of the deceased."  (*Id.* ¶ 153.)

Similarly, Smith entitles Count III as "Wrongful Death" and brings Count III against all Defendants.  (*Id.* 22–23 (capitalization omitted).)  In support of Count III, Smith states that "[p]ursuant to Virginia Code § 8.01-25, Plaintiff's claims are also actionable under the Virginia Wrongful Death Act."  (*Id.* ¶ 157.)

The Court will dismiss both Smith's survival claim in Count II and wrongful death claim in Count III.

### 1.  Legal Standard:  Virginia Wrongful Death/Survival Actions

Virginia Code § 8.01-25, which creates a survivorship action under Virginia law, states, in relevant part:

> Every cause of action whether legal or equitable, which is cognizable in the Commonwealth of Virginia, shall survive either the death of the person against whom the cause of action is or may be asserted, or the death of the person in whose favor the cause of action existed, or the death of both such persons. . . . Provided, further, that if the cause of action asserted by the decedent in his lifetime was for a personal injury and such decedent dies as a result of the injury complained of with a timely action for damages arising from such injury pending, the action shall be amended in accordance with the provisions of § 8.01-56.

Va. Code § 8.01-25.  Section 8.01-56,[36] to which § 8.01-25 refers, directs the reader to Virginia's Wrongful Death statute, § 8.01-50, which provides, in relevant part:

---

[36] Section 8.01-56 states:

> The right of action under § 8.01-50 shall not determine, nor the action, when brought, abate by the death, dissolution, or other termination of a defendant; and when a person who has brought an action for personal injury dies pending the action, such action may be revived in the name of his personal representative. If death resulted from the injury for which the action was originally brought, a motion for judgment and other pleadings shall be amended so as to conform to an action under § 8.01-50, and the case proceeded with as if the action had been brought under such section. In such cases, however, there shall be but one recovery for the same injury.

> Whenever the death of a person shall be caused by the wrongful act, neglect, or default of any person or corporation . . . and the act, neglect, or default is such as would, if death had not ensued, have entitled the party injured to maintain an action . . . and to recover damages in respect thereof, then, and in every such case, the person who, or corporation . . . which, would have been liable, if death had not ensued, shall be liable to an action for damages, . . . notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances, as amount in law to a felony.

Va. Code. § 8.01-50(A).

It is well settled that "a person may not recover for the same injury under the survival statute and the wrongful death statute." *Hendrix v. Daugherty*, 457 S.E.2d 71, 75 (Va. 1995) (discussing plaintiff's legal malpractice claims under both statutes). Under Virginia law, a survivorship action brought under § 8.01-25 "defers to the wrongful death statute as the exclusive statement of the grievances that Virginia will recognize when a tort victim dies of [his or] her injuries." *El-Meswari v. Wash. Gas Light Co.*, 785 F.2d 483, 490–91 (4th Cir. 1986); *see Winkler v. Medtronic, Inc.*, No. PX 18-865, 2018 WL 6271055, at *3 (D. Md. Nov. 29, 2018) (stating that "Virginia law does not recognize an independent survivorship action in addition to a wrongful death claim where 'the person dies from the injury or wrongful act.'" (citing cases)). Virginia law does, however, "allow a survivorship claim to be pleaded in the alternative, averring that if Defendant's conduct did not cause death, it nonetheless caused separate injury not resulting in death." *Id.* at *3 n. 4 (citing *Adams v. NaphCare, Inc.*, No. 2:16-cv-229, 2016 WL 10455885, at *5 n.2 (E.D. Va. Dec. 19, 2016), *report and recommendation adopted*, 232 F. Supp. 3d 866 (E.D. Va. 2017); *Centra Health, Inc. v. Mullins*, 277 Va. 59, 78 (2009)).

---

Va. Code § 8.01-56.

### 2. Because Smith Alleges that Jones Died Due to Defendants' Actions and the Wrongful Death Statute Provides the Exclusive Remedy for Such a Claim, Smith Has Failed to State a Survivorship Claim

Smith brings both a survivorship claim and a claim for wrongful death in the Amended Complaint. Smith "incorporates by reference herein each and every allegation" of her Amended Complaint into her survivorship claim in Count II and cites Defendants' alleged violations of 42 U.S.C. §§ 1983 and 1985 as the basis for her claim in Count II. (*See* Am. Compl. ¶¶ 152, 155.)

Throughout the Amended Complaint, Smith avers that Jones died as a result of Defendants' unconstitutional conduct. Based on her allegations, the Court has previously concluded that Smith can maintain her § 1983 excessive force claim against Officer Watters for Officer Watters's action in tasing Jones. However, Smith alleges that this tasing caused Jones's death. Because the wrongful death statute provides the exclusive method for recovery "when a tort victim dies of [his or] her injuries," the Court will dismiss Smith's survival action in Count II. *El-Meswari*, 785 F.2d at 490–91.

### 3. Although Smith Alleges that Jones Died as a Result of His Injuries, She Has Not Asserted a State Law Claim That Could Be Amended Under the Virginia Wrongful Death Statute

In Count III, Smith's wrongful death claim, she asserts that she is entitled to relief "under the Wrongful Death Statute for the Defendants['] violations of 42 U.S.C. § 1983 and 42 U.S.C. § 1985." (Am. Compl. ¶ 161.) Because Smith alleges that Jones died as a result of Defendants' allegedly unconstitutional conduct, Virginia's wrongful death statute provides the exclusive recovery for her claim under Virginia state law. However, Smith has asserted only federal claims against Defendants, therefore, given the failure of her survivorship claim, no Virginia state law claim exists that could be amended under the Wrongful Death Statute.

Under Virginia law, a representative may amend a personal injury action to become an action for wrongful death where an individual dies as a result of another's action. *See* Va. Code §§ 8.01-25, 8.01-50, 8.01-56. This is the exclusive method of recovery under Virginia law where an individual has died as the result of another's actions. *See El-Meswari*, 785 F.2d at 490–91. However, some state law claim undergird the wrongful death action because the state law claim will be amended to become the wrongful death action. *See* Va. Code §§ 8.01-25, 8.01-50, 8.01-56.

Here, Smith cites only to federal law in support of her wrongful death claim. Although several Defendants construe Smith's claims as if she had brought them under state law, Smith unequivocally clarifies that she "has not asserted any state law claims in her Amended Complaint." (Resp. Sheriff Defs. Mot. Dismiss 33.) Therefore, because even read favorably she has not alleged any *state* law claims against any Defendants that could be amended under Virginia's Wrongful Death Statute, Smith fails to state a claim in Count III. The Court will dismiss Count III against all Defendants.[37]

---

[37] Smith cites to the Supreme Court of Virginia's decision in *Hendrix* for the proposition that the Court should allow both her survival action and wrongful death claim to proceed until after discovery. (*See, e.g.*, Resp. South Hill Defs. Mot. Dismiss 32.) However, in *Hendrix* the Supreme Court of Virginia considered an appeal from the lower court's grant of the defendants' demurrers in a legal malpractice case. *See Hendrix*, 457 S.E.2d 71. In the underlying case the defendant attorneys "initially filed a tort action . . . as permitted by Code § 8.01-25, which allows the survival of a cause of action." *Id.* at 73. "Later, the attorneys amended the original motion for judgment, adding the product manufacturers as defendant and asserting a wrongful death claim pursuant to Code § 8.01-50. . . . [and] non[]suited the amended motion for judgment." *Id.* When the plaintiffs later refiled their case and elected to proceed under the Virginia Wrongful Death Statute on the advice of their attorneys, the court dismissed the case as barred by the applicable statute of limitations. *Id.* The plaintiffs then brought a legal malpractice suit against their attorneys. *Id.*

In the decision to which Smith cites, the *Hendrix* court stated that

[I]n the present action, at an appropriate time after discovery has been completed, the plaintiffs must be required to elect whether they will proceed against the defendant attorneys on the theory that the attorneys breached a duty owed to the

## H.    The Court Will Dismiss Smith's Claim for Prospective Injunctive Relief

In the Amended Complaint Smith seeks compensatory, nominal, and punitive damages. (Am. Compl. 28.)  She further seeks attorney's fees, costs, and expenses, as well as "injunctive relief to correct government procedure to prevent future injury." (*Id.* 29.)  Because Jones has passed, Smith fails to state a claim for prospective injunctive relief.

"[I]njunctive relief requiring a state official 'to conform his *future* conduct of that office to the requirement of the Fourteenth Amendment' is prospective in nature." *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 748 (4th Cir. 2018) (quoting *Edelman v. Jordan*, 415 U.S. 651, 664 (1974)).  The Fourth Circuit has stated that "'it is axiomatic' that 'a deceased litigant' cannot enjoy prospective injunctive relief.'"  *Id.* at 749 (quoting *Brown v. Town of Cary*, 706 F.3d 294, 299 (4th Cir. 2013), *abrogated on other grounds by Reed v. Town of Gilbert, Ariz.*, 135 S.Ct. 2218 (2015)).

Here, Smith seeks "injunctive relief to correct government procedure to prevent future injury." (Am. Comp. 29.)  Such injunctive relief is prospective.  *See Wicomico*, 910 F.3d at 748. Because Jones is deceased, he cannot enjoy such prospective injunctive relief.  *Id.* at 749. Therefore, the Court will dismiss Smith's request for prospective injunctive relief.

## IV.  Conclusion

For the foregoing reasons, the Court will grant the Sheriff Defendants Motion to Dismiss, (ECF No. 25); the Parrott and Zincone Motion to Dismiss, (ECF No. 29); and, the South Hill

---

> plaintiffs in the prosecution of the wrongful death action or breached a duty owed
> to the plaintiffs in the prosecution of the survival action.

*Id.* at 76.  Therefore, the *Hendrix* court allowed the plaintiffs to engage in discovery to determine which breach of duty they sought to hold their attorneys liable for.  This quote does not provide the legal proposition that Smith seeks.  She cannot plead in the alternative.

Defendants Motion to Dismiss, (ECF No. 31). The Court will also grant in part and deny in part the Officer Watters Motion to Dismiss. (ECF No. 27.)

The Court will allow only Smith's § 1983 excessive force claim, in Count I, to continue against Officer Watters in his individual capacity. Because in discovery Smith may identify other officers who were present at the scene and used excessive force, this § 1983 excessive force claim the Court will dismiss without prejudice this part of Count I against all of the other Individual Defendants in their individual capacities.

Because Smith has already attempted to cure the deficiencies in her Complaint by amending it in response to the Defendants' first motions to dismiss, the Court will dismiss the remaining counts with prejudice. First, the Court will dismiss with prejudice the § 1983 excessive force claims against the Town of South Hill and the Mecklenburg County Sheriff's Department. The Court will also dismiss with prejudice the § 1983 excessive force claims against Chief of Police Stuart Bowen and Sheriff R.W. "Bobby" Hawkins, Jr. in their capacities as supervisors. Second, the Court will also dismiss with prejudice the § 1983 deprivation of medical care and deprivation of life and physical liberty claim contained in Count I against all Defendants, including Officer Watters. Third, the Court will dismiss with prejudice Counts II–VI against all Defendants. Finally, the Court will dismiss with prejudice Smith's request for prospective injunctive relief against all Defendants.

Therefore, only Officer Watters and the unnamed police officers—which presumably includes some of the officers at the scene—remain as defendants in this matter.

The Court will direct the Clerk to attach ECF No 1-2, in which the Circuit Court for Mecklenburg Count designated Smith as the administrator of Jones's estate, to the Amended Complaint.

An appropriate order shall issue.

/s/

M. Hannah Lauck
United States District Judge

Date: 3/20/2020
Richmond, Virginia